DAVID B. GOLUBCHIK (State Bar No. 185520)
CARMELA T. PAGAY (State Bar No. 195603)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: DBG@LNBYG.COM; CTP@LNBYG.COM

Attorneys for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>CPIF LA ARTS DISTRICT LLC, a<br>Washington limited liability company,<br><br>Debtor and Debtor in Possession. | Case No.: 2:25-bk-12827-BB<br>Chapter 11 Case<br><br>**DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN, AS MODIFIED**<br><br><u>Plan Confirmation Hearing</u>:<br>Date: November 19, 2025<br>Time: 11:00 a.m.<br>Place: Courtroom 1539<br>      Roybal Federal Building<br>      255 East Temple Street<br>      Los Angeles, CA 90012 |

## I.

## INTRODUCTION

CPIF LA Arts District LLC (the "Debtor"), is the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case") bearing case number 2:25-bk-12827-BB.  The Debtor filed a voluntary petition under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 7, 2025 (the "Petition Date").  No official committee of creditors was formed in the Bankruptcy Case.  No bankruptcy trustee was appointed in the Bankruptcy Case.

Chapter 11 allows the Debtor, and, under some circumstances, creditors and other parties in interest, to propose a plan of reorganization, which may include a liquidation.  This First Amended Plan, As Modified ("Plan") is a liquidating plan proposed by the Debtor. Pursuant to an order entered on September 15, 2025, the Court determined that a disclosure statement describing the Plan was not required in this case.  [Dkt. No. 50].

On the Petition Date, the Debtor's primary asset was the mixed-use project located at 1129 and 1101 East 5th Street, 445-457 South Colyton Street, and 450-456 South Seaton Street, Los Angeles, CA 90013, consisting of one tax parcel totaling ±1.05 acres or ±45,722 square feet improved with a mixed-use property. The mixed-use property is 91,200 square feet which consists of nine retail units on the ground-floor and 13 apartments/lofts on the 2nd floor of the Property (the "Property").    See **Exhibit "1"** attached hereto which contains the Debtor's Schedule of Assets.

The Property is subject to first and second-priority deeds of trust in favor of Greyhawk Colyton Lender, LLC ("GCL").  GCL's trust deeds against the Property include an assignment-of-rents provision, and GCL has been granted a security interest in the "rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property."  Following discussions, GCL agreed to the Debtor's use of cash collateral and on April 9, 2025, a stipulation to that effect was filed [Doc. No. 8] (the "Cash Collateral Stipulation").  The Court's order approving such stipulation was entered on April 10, 2025 [Doc. No. 13] (the "Cash Collateral Order").

2

The Debtor also employed a real estate broker to market the Property for sale. Pending such sale efforts, because this is a single asset real estate case, after 90 days, the Debtor's affiliate commenced making interest payments on behalf of the Debtor to GCL.

The broker extensively marketed the Property through numerous channels, including online and direct solicitations. After extensive marketing efforts, the broker procured DTLA Management Corporation, a California corporation ("DMC" or "Buyer"), which expressed interest in purchasing the Property. After consideration and negotiations of numerous expressions of interest, on or about September 12, 2025, the Debtor entered into a Purchase and Sale Agreement ("PSA") with DMC for a price of $12,500,000, a copy of which is attached as **Exhibit "4"** hereto. DMC currently owns and operates several live-work buildings in the Arts District similar to the Property, and all of which are within two miles or less of the Property.

As discussed below, the anticipated sale proceeds, provided that the sale closes, will be sufficient to pay 100% of all allowed claims in full. Based on the fact that all claims will be paid in full, the Debtor asserts that all classes of claims provided for under this Plan are unimpaired and deemed to have accepted the Plan. Any proceeds remaining after satisfaction of claims will inure to the Debtor, subject to the rights of its equity holder.

The effective date of the Plan (the "Effective Date") will be the first business day which is at least two (2) business days after both of the following occur: (a) the date of entry of the Court order confirming the Plan (the "Plan Confirmation Order"); and (b) closing of the sale transaction contemplated under this Plan. In other words, this Plan can only go effective in the event of a sale closing. The Debtor, following the Effective Date, will be referred to as the "Reorganized Debtor." In the event that the sale does not close by January 16, 2026, then relief from stay will be deemed to have been granted to GCL to proceed with its non-bankruptcy remedies.

## II.

## SUMMARY OF THE PLAN

### A.    What Creditors and Interest Holders Will Receive Under the Plan

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their rights to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

### B.    Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtor has not placed the following claims in a class:

#### 1.    Administrative Expenses

Administrative expenses are claims for costs or expenses of administering the Case that are allowed under Bankruptcy Code Section 507(a)(1). The Bankruptcy Code requires that all administrative claims be paid on the Effective Date unless a particular claimant agrees to a different treatment.

The following chart lists all of the Debtor's 11 U.S.C. § 507(a)(1) administrative claims and their treatment under the Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| Levene, Neale, Bender, Yoo & Golubchik L.L.P. ("LNBYG"), bankruptcy counsel for the Debtor | $30,000 (estimated net of pre-petition retainer) | Paid in full upon the later of (a) the Effective Date; and (b) the date of entry of the order allowing the final fee application. |
| Cushman and Wakefield, real estate broker for the Debtor | 3% purchase price (includes buy and sell side of transaction) | Pursuant to employment agreement, will be paid in full directly from escrow as sale closing. |

4

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| Clerk's Office Fees | $0 (estimated) | The Debtor is not aware of any fees presently owed to the Clerk's Office. To the extent such fees will exist on the Effective Date, they shall be paid in full on or before the Effective Date. |
| Office of the U.S. Trustee Fees | $83,200 (estimated based on anticipated distributions) | Paid in full on the Effective Date to the extent any amount is owed. |
| **TOTAL** | $113,200 (estimated) | |

Court Approval of Fees Required:

The Court must rule on all fees listed in this chart before the fees will be owed, except for fees owing to the Clerk's Office, U.S. Trustee, or fees to be paid from non-Debtor sources. The professional in question must file and serve a properly noticed fee application, and the Court must rule on the application.  Only the amount of fees and expenses allowed by the Court will be owed and required to be paid under the Plan.  As discussed herein, the Debtor will have sufficient funds from sale proceeds to satisfy all such claims in full.

## 2.    Priority Tax Claims

Priority tax claims are certain unsecured income, employment and other taxes described by Bankruptcy Code Section 507(a)(8).  The Bankruptcy Code requires that each holder of such a Section 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding five (5) years from the date the bankruptcy petition was filed.

The Debtor is not aware of any priority tax claims asserted against the estate.

## C.    Classified Claims and Interests

## 1.    Class of Secured Claims

The following chart identifies the Plan's treatment of the classes of secured claims, which are referenced in **Exhibits "2"** (Schedules of Liabilities) and **"3"** (Claims Register) attached hereto, under the Plan:

5

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1 | Creditor GCL<br><br>Amount of Claims Approximately $10,361,950 (per Claim Nos. 2 and 3 - includes first and second liens) | N | N | The undisputed portion of Class 1 claims will be paid in full from sale proceeds upon closing of the sale of the Property.  To the extent that a dispute exists, any unpaid claims will attach to the sale proceeds with the same validity, priority and extent as GCL was entitled to prior to the sale, with additional distributions to be made pursuant to order of the Court. |
| 2 | Creditor Los Angeles County Tax Collector<br><br>Amount of Claims Approximately $0.00 | N | N | Per Schedule D, claim schedules as 0.00.  No proof of claim filed. To the extent a claim is outstanding at time of sale closing, such Class 2 claim will be paid in full from sale proceeds upon closing of the sale of the Property. |

### 2.    Class of General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under Bankruptcy Code Section 507(a).  The following chart identifies the Plan's treatment of the class containing all of the Debtor's general unsecured claims (See **Exhibits "2"** (Schedule of Liabilities) and **"3"** (Claims Register) attached hereto):

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 3 | Claims All Allowed General Unsecured Claims<br><br>Amount of Claims Approximately $12,580.00 | N | N | Holders of allowed Class 3 claims shall receive payment in an amount equal to 100% of their allowed pre-petition claims against the Debtor plus post-petition interest at the federal judgment rate under 28 U.S.C. § 1961 (est. 3.61%) on the Effective Date of the Plan or as soon as practical thereafter. |

### 3.    Class of Equity Holders

Interest holders are the parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor.  The following chart identifies the Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 4 | All Equity Interests in Debtor | N | Class 4 equity holders shall retain their interest in the Debtor and shall have all the rights of equity holders after the Effective Date. |

## D.    Means of Effectuating the Plan

### 1.    Funding for the Plan and Post Effective Date Reserve

This Plan is premised on the sale of the Property for a gross sale price of $12,500,000, which sale is to close concurrently with the Effective Date of the Plan. Following is a waterfall analysis of anticipated sale proceeds and application of the proceeds to estate claims.

| | | |
|---|---|---|
| Gross Sale Proceeds | | $12,500,000 |
| Less Costs of Sale (est. 6%) | | <$750,000> |
| Net Amount Available Under Plan | | $11, 750,000 |
| | | |
| Class 1 Secured Claim | GCL (as asserted, subject to Debtor's review) | <$10,361,950> |
| Class 2 Secured Claim | LA County Tax Collector | <$0.00> |
| Admin Claim | LNBYG | Est. <$30,000> |
| Admin Claim | UST | Est. <$83,200> |
| Class 3 | General Unsecured Creditors (includes interest) | <$13,100> |
| **TOTAL** | | **$1,261,750** |

Based on the foregoing, the Debtor is confident that it will have sufficient funds to make

all required Effective Date payments, thereby rendering all classes of creditors unimpaired.

### 2. Post-confirmation Management

Since this is a liquidating Plan, the Debtor does not anticipate the need for active management after the Effective Date. However, existing equity will remain in place and manage the Reorganize Debtor, to the extent necessary.

### 3. Disbursing Agent

The Reorganized Debtor shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. It is anticipated that claims related to sale closing and secured claims will be paid directly from escrow but, if this does not occur, the Reorganized Debtor shall make such distributions promptly in accordance with the provisions of this Plan. The Disbursing Agent shall serve without bond and shall not receive compensation for its disbursement services under the Plan.

### 4. Objections to Claims

The Debtor is in the process of reviewing filed claims, including the secured claims of GCL. To the extent a dispute exists which is not resolved by the time of the Plan confirmation hearing, the Debtor will file its objection not later than 30 days after the Effective Date. Funds related to claims subject to dispute shall be maintained in the estate's Debtor-In-Possession bank account pending resolution of claim or order of this Court. As set forth in the Plan, allowed claims shall receive the full value of their claims plus interest as set forth above.

Pursuant to 11 U.S.C. § 502(a), any party in interest may assert objections to claims. Objections to claims shall be filed not later than thirty (30) days after the Effective Date. As provided by Section 502(c) of the Bankruptcy Code, the Court may estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan. The Court shall retain jurisdiction over the Debtor, the Reorganized Debtor, and the Case to resolve such objections to claims following the confirmation of the Plan.

Nothing contained in the Plan shall constitute a waiver or release by the Debtor of any rights of setoff or recoupment, or of any defense, it may have with respect to any claim. The

Reorganized Debtor shall withhold from property to be distributed under the Plan and will place in reserve a sufficient amount of cash to be distributed on account of claims that are disputed and have not been allowed as of the date of distribution to creditors (the "<u>Disputed Claims</u>") of any particular class as if such claims were allowed in full.

### 5. Interest Pending Allowance of Claims

Except as specifically provided for in the Plan, in the Plan Confirmation Order, or in some other order of the Court, holders of general unsecured claims shall be entitled to interest accruing on or after the Petition Date on any allowed claim at the federal judgment rate pursuant to 28 U.S.C. § 1961, which is currently approx. 3.61%.

### 6. Distributions to Be Made Pursuant to the Plan

Distributions to be made by the Reorganized Debtor on the Effective Date on account of any claim shall be made on the Effective Date or as promptly thereafter as practicable, to the extent not paid from escrow at sale closing. Distributions to be made by the Reorganized Debtor under the Plan shall be made by check drawn on a domestic bank or by wire transfer at the sole election of the Reorganized Debtor.

Except as otherwise agreed to by the Reorganized Debtor in writing, distributions to be made to holders of allowed claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address shown in the Debtor's schedules, as they may from time to time be amended in accordance with Bankruptcy Rule 1009, or, if a different address is stated in a proof of claim duly filed with the Court, to such address.

Checks issued by the Reorganized Debtor to pay allowed claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Reorganized Debtor by the holder of the allowed claim to whom such check originally was issued, prior to the expiration of one hundred and twenty (120) days from the date of issuance of such check. After such date, the claim shall be deemed disallowed and the monies otherwise payable on account of such claim shall revest in the Reorganized Debtor free and clear of all claims and interests.

In connection with the Plan and any instruments issued in connection therewith, the Reorganized Debtor shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

### 7.    Avoidance Actions

The Debtor reviewed its books and records and investigated whether avoidance claims exist.  Based on such review and investigation, the Debtor is not aware of any payments made during the ninety-day preference period for non-insiders or the one-year period for insiders which would be clearly avoidable as preference payments.  Moreover, pursuant to the Plan, all claims will be satisfied in full and therefore no need for pursuit of avoidance actions exists.

Nevertheless, all claims, causes of action and avoidance actions of the Debtor and its estate are preserved by the Plan, and the Reorganized Debtor shall have full power and authority to settle, adjust, retain, enforce or abandon any claim, cause of action or avoidance action as the representative of the Debtor's estate under section 1123(b) of the Bankruptcy Code or otherwise, regardless of whether such claims, causes of action or avoidance actions were commenced prior or subsequent to the Effective Date.

### 8.    Exemption from Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of the Bankruptcy Code, may not be taxed under any law imposing a stamp tax or similar tax.  Transfers under the Plan that are exempt from taxes under section 1146(c) of the Bankruptcy Code include all transfers by the Debtor after the commencement of the Bankruptcy Case in contemplation of the Plan.  The taxes from which such transfers are exempt include stamp taxes, recording taxes, sales and use taxes, transfer taxes, and other similar taxes, including, without limitation, Measure ULA tax.

### 9.    Exculpations and Releases

To the maximum extent permitted by law, on the Effective Date, the Debtor and its

officers, directors, counsel, financial advisors or other agents and their successors and assigns retained by the Estate, but only to the extent that such parties were closely involved with the drafting of the Plan or sale of the Property (each, a "<u>Released Person</u>"), shall not have or incur liability to (except for gross negligence or willful misconduct, including fraud, malpractice, or breach of fiduciary duty) any person or entity for an act taken or omission made in good faith in connection with or related to the formulation of the Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the transactions contemplated therein.

Notwithstanding the foregoing, this provision of the Plan is not intended to waive or release any cause of action based on pre-petition actions or conduct or any cause of action based on post-effective date actions or conduct. It also shall not exculpate any act or omission, forbearance from action, decision, or exercise of discretion taken after the Effective Date by an attorney to the extent such exculpation would violate the California Rules of Professional Conduct such as claims related to professional malpractice. Further, this provision shall not act as a shield to any exculpated parties who rely upon the advice of counsel. Although such reliance may be raised as an affirmative defense, it will not serve as a predetermined absolute bar against liability and is not intended to discharge potential consequences from the California State Bar of California, or by a Professional, to the extent that inclusion of such exculpation in the Plan is later determined to have been prohibited by 11 U.S.C. § 1125(e).

**E.    <u>Risk Factors</u>**

The Debtor believes that there is virtually no risk associated with its making of the Effective Date payments under the Plan.  The only risk is that the sale not closing, which is a basis for Plan confirmation; however, without a sale, there will be no Effective Date.  In the event that the sale does not close by January 16, 2026, relief from stay will be deemed to have been granted to GCL to pursue its non-debtor remedies.

11

**F.      Other Provisions of the Plan**

    **1.      Sale of Property Should Be Approved**

A court considering a sale under Section 363(b) should determine from the evidence presented before it that a "good business reason" exists to grant such a motion. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).  In addition, the court must further find that the sale is in the best interest of the estate.   To make this determination, the Court should consider whether:

    (1)    the sale is fair and reasonable, *i.e.*, the price to be paid is adequate;
    (2)    the property has been given adequate marketing;
    (3)    the sale is in good faith, *i.e.*, there is an absence of any lucrative deals with insiders, and
    (4)    adequate notice has been provided to creditors.

*In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); *In re Mama's Original Foods, Inc.,* 234 B.R. 500, 502-505 (C.D. Cal. 1999).   Here, the proposed sale of the Property to the Buyer satisfies each of these requirements.

    **a.      Sound Business Purpose.**

The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (B.A.P. 9th Cir. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).   The facts pertaining to the sale at issue here amply substantiate the Debtor's business decision that the contemplated sale of the Property to the Buyer pursuant to the terms of the PSA serves the best interests of the estate and merits the approval of this Court.

As noted above, the Debtor's exit strategy is based on the sale of the Property to generate funds to pay creditors as much as possible.   After substantial marketing of the Property, the purchase price offered by the Buyer is the highest and best binding offer received by the Debtor.   Importantly, the proposed price is sufficient to pay all claims in full.   Based on

the foregoing, the proposed sale furthers the Debtor's exit strategy and is in the best interests of the estate and its creditors and, therefore, represents a sound exercise of the Debtor's business judgment.

### b.    Fair and Reasonable Price.

In order for a sale to be approved under Section 363(b), the purchase price must be fair and reasonable.  *See generally, In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985).  The trustee is given substantial discretion in this regard.  *Id.*  In addition, Courts have broad discretion with respect to matters under section 363(b).  *See Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985).  In any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold.  *Wilde Horse Enterprises, Inc.*, 136 B.R. at 841 (*citing In re Chung King, Inc.*, 753 F.2d 547 (7th Cir. 1985)), *In re Alpha Industries, Inc.*, 84 B.R. 703, 705 (Bankr. Mont. 1988).

As noted above, the Debtor's broker engaged in expansive marketing efforts regarding the sale of the Property.  The proposed sale to Buyer represents the best and highest price received by the Debtor which will suffice to pay all debts in full.  The only potential impacted party would be the Debtor's equity holder which is the party causing the Debtor to propose this Plan and consents to the current sale price.  Based on the foregoing, the Debtor submits that the purchase price represents fair and reasonable value for the Property in today's marketplace.

### c.    Adequate Marketing.

The expansive efforts were undertaken by Debtor's broker to market the Property.  Broker's testimony will be provided as part of the briefs and pleadings in support of Plan confirmation.

### d.    Good Faith.

When a Bankruptcy Court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser.  *In re Abbotts Dairies*, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent creditor protections.  *Id.* at 150.  With respect to the Debtor's conduct

in conjunction with the proposed sale of the Property, the good faith requirement focuses principally on whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Dairies*, 788 F.2d at 147; *Wilde Horse Enterprises*, 136 B.R. at 842.

Here, the broker, through its marketing efforts, located the buyer. The terms of the sale were negotiated by representatives of the Debtor and Buyer at arms-length, with the assistance of respective real estate brokers and counsel. The PSA was jointly drafted. Based on the foregoing, the Debtor submits that the proposed sale is the result of arms-length negotiations. In addition, other than in connection with the proposed sale of the Property, the Buyer and its insiders have no prior connections with the Debtor and its insiders. Further, the Debtor has no basis to believe that the sale transaction was the product of any collusion.

Based on the foregoing, and because the Buyer has no affiliation with the Debtor, other than in connection with the proposed sale of the Property described herein, and is not an "insider" of the Debtor, as that term is defined in Section 101(31), and the sale was, and continues to be, negotiated at arms-length, the Debtor submits that there has been no fraud or collusion in connection with the proposed sale of the Property. Therefore, the good faith requirement has been satisfied.

### e.    <u>Accurate and Reasonable Notice.</u>

The purpose of the notice is to provide an opportunity for objections and hearing before the Court if there are objections. *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D.Pa. 1988). A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections. *Id.* Here, the sale is being sought as part of the Plan confirmation process. The scheduling of the Plan confirmation hearing, incorporating the sale, is such to allow creditors and parties in interest more than sufficient time to review and consider the pleadings. However, as discussed above, the sale will result in proceeds to pay all claims in full and, as a result, the Debtor submits that no creditor or party in interest should have any objections with, or concerns about, the sale transaction.

14

**f.    Sale Free and Clear of Liens Is Appropriate.**

The Court has the power to authorize the sale of property free and clear of liens, claims, or interests.  *See* 11 U.S.C. § 363(f); *In re Gerwer*, 898 F.2d 730, 733 (9th Cir. 1990).  Section 363(f) permits a sale of property "free and clear of any interest in such property of an entity other than the estate" if ***any one*** of the following five conditions is met:

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

> (2)    such entity consents;

> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

> (4)    such interest is in bona fide dispute; or

> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Section 363(f) is written in the disjunctive; thus, satisfaction of any one of the five conditions is sufficient to sell property free and clear of liens.  *See e.g., Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); *Mutual Life Ins. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*, 36 B.R. 856, 858 (Bankr. W.D. Mo. 1984).

Here, the sale of  the Property to the Buyer can be free and clear of all liens, claims, encumbrances, and interests because one or more provisions of Section 363(f) has been or will be satisfied as to each alleged secured claim.

**g.  Section 363(f)(2).**

In regard to Section 363(f)(2), the "consent" of an entity asserting an interest in the property sought to be sold, as referenced in Section 363(f)(2), can be implied if such entity fails to make a timely objection to the sale after receiving notice of the sale.  *In re Eliot,* 94 B.R. 343, 345 (E.D. Pa. 1988).  In the *Eliot* case, the bankruptcy court approved the sale by a trustee

of certain real property that was subject to a mortgage in favor of Citicorp.  Citicorp had received notice of the sale, but did not file any timely objection to the sale.  After the sale occurred, Citicorp filed a motion to set aside the sale, which was handled by the bankruptcy court as an adversary proceeding.  The bankruptcy court dismissed the complaint to set aside the sale, and Citicorp appealed the ruling.  The district court affirmed the dismissal, and, in so doing, stated:

> … if any of the five conditions of § 363(f) are met, the Trustee has the authority to conduct the sale free and clear of all liens.
>
> In this case, the authority for the sale can be found in 11 U.S.C. § 363(f)(2).  That section allows the Trustee to sell the property free and clear of all liens because Citicorp consented to the sale.  **Citicorp consented to the sale by failing to make any timely objection after receiving notice of the sale.**  Citicorp contends that implied consent is insufficient to satisfy the consent requirement of § 363(f)(2).  I disagree.

*Eliot,* 94 B.R. at 345 (emphasis added).  In its ruling, the *Eliot* court relied on *In re Gabel*, 61 B.R. 661 (Bankr. W.D. La. 1985), which held that implied consent is sufficient to authorize a sale under § 363(f)(2).  *See also, In re Ex-Cel Concrete Company, Inc.*, 178 B.R. 198, 203 (B.A.P. 9th Cir. 1995) ("The issue here is whether there was consent or non-opposition by Citicorp."); *In re Paddlewheels, Inc.*, 2007 WL 1035151 (Bankr. E.D.La. April 2, 2007) ("The Sale Motion complies with section 363(f) of the Bankruptcy Code, in that the Trustee either obtained the consent of Whitney to the sale of the Vessel to Buyer or Whitney had no objection to the Sale.").

The Debtor believes that GCL, as the only creditor asserting an interest in the Property, will consent to the proposed sale of the Property, either affirmatively or by the absence of any objection thereto.

### h.  Section 363(f)(3).

In regard to Section 363(f)(3), the proposed sale price for the Property is substantially greater than all liens asserted therein.  As a result, under 11 U.S.C. § 362(f)(3), a sale free and

clear of liens is proper in this case.

### 2.    Executory Contracts and Unexpired Leases

The Debtor is not aware of any other leases or executory contracts to assume or reject. However, out of the abundance of caution, on the Effective Date, any and all leases or executory contracts that the Debtor has an interest in will be deemed rejected.

### 3.  Changes in Rates Subject to Regulatory Commission Approval

This Debtor is not subject to governmental regulatory commission approval of its rates.

### 4. Relief From Stay To GCL

In the event that the sale of the Property does not close by January 16, 2026, then relief from stay will be deemed to be granted in favor of GCL to pursue its non-bankruptcy remedies with respect to the Property.

### 5.  Retention of Jurisdiction

After confirmation of the Plan and occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as is legally permissible including for the following purposes:

i.    To resolve any and all disputes regarding the operation and interpretation of the Plan and the Plan Confirmation Order;

ii.    To determine the validity, classification, or priority of claims and interests upon objection by the Debtor, the Reorganized Debtor, or by other parties in interest with standing to bring such objection or proceeding;

iii.    To determine the extent, validity and priority of any lien asserted against property of the Debtor or property of the Debtor's estate;

iv.    To construe and take any action to enforce the Plan, the Plan Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Plan Confirmation Order, and all matters referred to in the Plan, the Plan Confirmation Order, and to determine all matters that may be pending before the Court in this Case on or before the Effective Date with

respect to any person or entity related thereto;

v.      To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

vi.      To determine any request for payment of administrative expenses;

vii.      To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this Case whether before, on, or after the Effective Date;

viii.      To determine such other matters and for such other purposes as may be provided in the Plan Confirmation Order;

ix.      To modify the Plan under Section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

x.      Except as otherwise provided in the Plan or the Plan Confirmation Order, to issue injunctions to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Plan Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Plan Confirmation Order;

xi.      To issue such orders in aid of consummation of the Plan or the Plan Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

xii.      To enter a final decree closing this Case.

## III.

## EFFECT OF CONFIRMATION OF PLAN

**A.     Discharge**

This is a liquidating Plan.  Pursuant to 11 U.S.C. § 1141(d)(3)(A), confirmation of this

Plan will not result in a discharge for the Debtor.

**B.      Revesting of Property in the Reorganized Debtor**

Except as provided elsewhere herein, the confirmation of the Plan revests all of the property of the estate in the Reorganized Debtor.  In addition, on the Effective Date, all of the claims against and/or interests in third parties that constitute property of the estate shall be revested in the Reorganized Debtor.  Following the Effective Date, the Reorganized Debtor shall have absolute authority to prosecute, waive, adjust or settle any claims without the need for approval by the Court.  Following the Effective Date, the Reorganized Debtor shall have the authority to employ such professionals as it deems necessary to prosecute or defend such claims asserted without the need for Court approval.

**C.      Default**

Except as otherwise provided herein, in the Plan Confirmation Order, or otherwise by order of this Court during the pendency of the bankruptcy proceeding, in the event that the Reorganized Debtor defaults in the performance of any of its obligations under the Plan and shall not have cured such a default within thirty (30) days after receipt of written notice of default from the creditor to whom the performance is due, then the entity or individual to whom the performance is due may pursue such remedies as are available at law or in equity.  An event of default occurring with respect to one claim shall not be any event of default with respect to any other claim.

**D.      Modification of Plan**

The Debtor may modify the Plan at any time before confirmation.  The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed modifications after notice and a hearing.

**E.      Post-Confirmation Status Report**

Within 30 days following the entry of the Plan Confirmation Order, the Reorganized Debtor shall file a status report with the Court explaining what progress has been made toward

19

consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice after the Effective Date.

**F.      Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the Case under § 1112(b) after the Plan is confirmed if there is a default in performing the Plan.  If the Court orders the Case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will re-vest in the Chapter 7 estate.  Unless otherwise ordered by the Court, the automatic stay will be re-imposed upon the re-vested property, but only to the extent that the Court did not previously authorize relief from stay during the Case.  The Plan Confirmation Order may also be revoked under very limited circumstances.  The Court may revoke the Plan Confirmation Order if the Plan Confirmation Order was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the Plan Confirmation Order.

**G.      Post-Confirmation U.S. Trustee Fees**

The Reorganized Debtor shall be responsible for the timely payment of all fees incurred after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6).

**H.      Final Decree**

Once this estate has been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor or other party as the Court shall designate in the Plan Confirmation Order shall file a motion with the Court to obtain a final decree to close the Case.

Dated: October 9, 2025               CPIF LA ARTS DISTRICT LLC, a
                                     Washington limited liability company


                                      _/S/ Kevin Quinn_____
                                     By:    Kevin Quinn
                                     Its:    Authorized Representative

20

1

2 Presented By:
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.

3

4 By:____/s/ David B. Golubchik_____
       DAVID B. GOLUBCHIK
5       CARMELA T. PAGAY
6 LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
Attorneys for Chapter 11 Debtor and Debtor in Possession

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2
## EXHIBIT "1"

3
[Schedule of Assets]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Fill in this information to identify the case: | |
| --- | --- |
| Debtor name | **CPIF LA Arts District LLC, a Washington limited liability company** |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION |
| Case number (if known) | |

☐ Check if this is an amended filing

# Official Form 206A/B
## Schedule A/B: Assets - Real and Personal Property

12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

### Part 1: Cash and cash equivalents

**1. Does the debtor have any cash or cash equivalents?**

☑ No. Go to Part 2.
☐ Yes Fill in the information below.

**All cash or cash equivalents owned or controlled by the debtor**

Current value of debtor's interest

### Part 2: Deposits and Prepayments

**6. Does the debtor have any deposits or prepayments?**

☐ No. Go to Part 3.
☑ Yes Fill in the information below.

7. **Deposits, including security deposits and utility deposits**
Description, including name of holder of deposit

| | | |
| --- | --- | --- |
| 7.1. | **Pre-paid insurance** | $9,276.00 |
| 7.2. | **Prepaid utility deposits** | $3,200.00 |

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**
Description, including name of holder of prepayment

9. **Total of Part 2.**
Add lines 7 through 8. Copy the total to line 81.

$12,476.00

### Part 3: Accounts receivable

**10. Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.
☑ Yes Fill in the information below.

11. **Accounts receivable**

| Debtor | **CPIF LA Arts District LLC, a Washington limited liability company** | Case number *(If known)* | |
|---|---|---|---|
| | Name | | |

| 11a. 90 days old or less: | 89,800.00 | - | 0.00 | = .... | $89,800.00 |
|---|---|---|---|---|---|
| | face amount | | doubtful or uncollectible accounts | | |

**12.** **Total of Part 3.**
Current value on lines 11a + 11b = line 12. Copy the total to line 82.

| | $89,800.00 |
|---|---|

**Part 4:** **Investments**

13. **Does the debtor own any investments?**

■ No. Go to Part 5.
☐ Yes Fill in the information below.

**Part 5:** **Inventory, excluding agriculture assets**

18. **Does the debtor own any inventory (excluding agriculture assets)?**

■ No. Go to Part 6.
☐ Yes Fill in the information below.

**Part 6:** **Farming and fishing-related assets (other than titled motor vehicles and land)**

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

■ No. Go to Part 7.
☐ Yes Fill in the information below.

**Part 7:** **Office furniture, fixtures, and equipment; and collectibles**

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

■ No. Go to Part 8.
☐ Yes Fill in the information below.

**Part 8:** **Machinery, equipment, and vehicles**

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

■ No. Go to Part 9.
☐ Yes Fill in the information below.

**Part 9:** **Real property**

54. **Does the debtor own or lease any real property?**

☐ No. Go to Part 10.
■ Yes Fill in the information below.

55.    **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building, if available. | | | | |

Debtor **CPIF LA Arts District LLC, a Washington limited liability company**
       Name

Case number *(if known)*

| | | | | | |
|---|---|---|---|---|---|
| 55.1. | **mixed use project located at 1129 and 1101 East 5th Street, 445-457 South Colyton Street, and 450-456 South Seaton Street, Los Angeles, CA 90013. consisting of one tax parcel totaling ±1.05 acres or ±45,722 square feet that is currently improved with a mixed-use property. The mixed-use property is 91,200 square feet which consists of nine retail units on the ground-floor and 13 apartments/lofts on the 2nd floor of the property.** | 100% owned | $0.00 | Appraisal | $22,600,000.00 |

56. **Total of Part 9.**
    Add the current value on lines 55.1 through 55.6 and entries from any additional sheets.
    Copy the total to line 88.

    $22,600,000.00

57. **Is a depreciation schedule available for any of the property listed in Part 9?**
    ☑ No
    ☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**
    ☑ No
    ☐ Yes

**Part 10:    Intangibles and intellectual property**

**59. Does the debtor have any interests in intangibles or intellectual property?**

    ☑ No. Go to Part 11.
    ☐ Yes Fill in the information below.

**Part 11:    All other assets**

**70. Does the debtor own any other assets that have not yet been reported on this form?**
    Include all interests in executory contracts and unexpired leases not previously reported on this form.

    ☑ No. Go to Part 12.
    ☐ Yes Fill in the information below.

| Debtor | CPIF LA Arts District LLC, a Washington limited liability company | Case number *(If known)* | |
|---|---|---|---|
| | Name | | |

**In Part 12 copy all of the totals from the earlier parts of the form**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1* | $0.00 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $12,476.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $89,800.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $0.00 | |
| 88. **Real property.** *Copy line 56, Part 9.....................................................>* | | $22,600,000.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column | $102,276.00 | + 91b. $22,600,000.00 |
| 92. **Total of all property on Schedule A/B.** Add lines 91a+91b=92 | | $22,702,276.00 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>EXHIBIT "2"</u>**

[Schedule of Liabilities]

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **CPIF LA Arts District LLC, a Washington limited liability company** |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION |
| Case number (if known) | |

☐ Check if this is an amended filing

## Official Form 206D
## Schedule D: Creditors Who Have Claims Secured by Property          12/15

Be as complete and accurate as possible.

1. Do any creditors have claims secured by debtor's property?

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

☑ Yes. Fill in all of the information below.

### Part 1:   List Creditors Who Have Secured Claims

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | Column A | Column B |
|---|---|---|---|
| | | Amount of claim | Value of collateral that supports this claim |
| | | Do not deduct the value of collateral. | |

**2.1  GREYHAWK COLYTON LENDER, LLC**
Creditor's Name

c/o David Zaro, Esq., Allen Matkins
865 South Figueroa Street, 28th Fl
Los Angeles, CA 90017
Creditor's mailing address

Creditor's email address, if known

Date debt was incurred

Last 4 digits of account number

**Describe debtor's property that is subject to a lien**
mixed use project located at 1129 and 1101 East 5th Street, 445-457 South Colyton Street, and 450-456 South Seaton Street, Los Angeles, CA 90013. consisting of one tax parcel totaling ±1.05 acres or ±45,722 square feet that is currently imp

Describe the lien

**Is the creditor an insider or related party?**
☑ No
☐ Yes

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Amount of claim: **$9,694,321.77**
Value of collateral: **$22,600,000.00**

**Do multiple creditors have an interest in the same property?**
☐ No
☑ Yes. Specify each creditor, including this creditor and its relative priority.
1. Los Angeles County Tax Collector
2. GREYHAWK COLYTON LENDER, LLC

**2.2  Los Angeles County Tax Collector**
Creditor's Name

P.O. Box 54018
Los Angeles, CA 90054-0018
Creditor's mailing address

**Describe debtor's property that is subject to a lien**
mixed use project located at 1129 and 1101 East 5th Street, 445-457 South Colyton Street, and 450-456 South Seaton Street, Los Angeles, CA 90013. consisting of one tax parcel totaling ±1.05 acres or ±45,722 square feet that is currently imp

Describe the lien

Amount of claim: **$0.00**
Value of collateral: **$22,600,000.00**

| Official Form 206D | Schedule D: Creditors Who Have Claims Secured by Property | page 1 of 2 |
|---|---|---|

Debtor **CPIF LA Arts District LLC, a Washington limited liability company**

Name

Case number (if known) _____

**Statutory Lien**

**Is the creditor an insider or related party?**

☑ No

☐ Yes

**Is anyone else liable on this claim?**

☑ No

☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Creditor's email address, if known _____

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**

☐ No

☑ Yes. Specify each creditor, including this creditor and its relative priority.

**Specified on line 2.1**

**As of the petition filing date, the claim is:**
Check all that apply

☐ Contingent

☐ Unliquidated

☐ Disputed

---

3. Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.

| $9,694,321.77 |

**Part 2:    List Others to Be Notified for a Debt Already Listed in Part 1**

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name  and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| | | |

| Fill in this information to identify the case: |
|---|

| Debtor name | **CPIF LA Arts District LLC, a Washington limited liability company** |
|---|---|
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION |
| Case number (if known) | _____ |

☐ Check if this is an amended filing

# Official Form 206E/F
## Schedule E/F: Creditors Who Have Unsecured Claims          12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

| Part 1: | List All Creditors with PRIORITY Unsecured Claims |
|---|---|

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

   ☐ No. Go to Part 2.

   ☑ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  |  | | Total claim | Priority amount |
|---|---|---|---|---|
| 2.1 | Priority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | **$0.00** | **$0.00** |
| | **Franchise Tax Board**<br>**Special Procedures - Insolvency**<br>**P.O. Box 2952**<br>**Sacramento, CA 95812-2952** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Notice** | | |
| | Last 4 digits of account number | Is the claim subject to offset? | | |
| | Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8) | ☑ No<br>☐ Yes | | |

| 2.2 | Priority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | **$0.00** | **$0.00** |
|---|---|---|---|---|
| | **Internal Revenue Service**<br>**Insolvency I Stop 5022**<br>**300 N. Los Angeles St., #4062**<br>**Los Angeles, CA 90012-9903** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Notice** | | |
| | Last 4 digits of account number | Is the claim subject to offset? | | |
| | Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8) | ☑ No<br>☐ Yes | | |

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

Amount of claim

| Debtor | CPIF LA Arts District LLC, a Washington limited liability company |
|---|---|
| | Name |

Case number (if known) _____

| 3.1 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $12,180.00 |
|---|---|---|---|

**Apocalypse Security Inc.**
3462 E. 14th Street
Los Angeles, CA 90023

Date(s) debt was incurred __
Last 4 digits of account number __

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Security**

Is the claim subject to offset? ☐ No  ☐ Yes

| 3.2 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | Unknown |
|---|---|---|---|

**LA DWP**
P.O. Box. 30808
Los Angeles, CA 90030

Date(s) debt was incurred __
Last 4 digits of account number __

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Utilities**

Is the claim subject to offset? ■ No  ☐ Yes

| 3.3 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $0.00 |
|---|---|---|---|

**SVN Elevate**
454 Seaton St.
Los Angeles, CA 90013

Date(s) debt was incurred __
Last 4 digits of account number __

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **Property management company**

Is the claim subject to offset? ■ No  ☐ Yes

| 3.4 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $400.00 |
|---|---|---|---|

**TVM Development**
278 Calle Orovista
Camarillo, CA 93012

Date(s) debt was incurred __
Last 4 digits of account number __

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  **building vendor**

Is the claim subject to offset? ☐ No  ☐ Yes

---

**Part 3:**   **List Others to Be Notified About Unsecured Claims**

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|

---

**Part 4:**   **Total Amounts of the Priority and Nonpriority Unsecured Claims**

5. Add the amounts of priority and nonpriority unsecured claims.

| | | Total of claim amounts |
|---|---|---|
| 5a. Total claims from Part 1 | 5a. $ | 0.00 |
| 5b. Total claims from Part 2 | 5b. + $ | 12,580.00 |
| 5c. Total of Parts 1 and 2 Lines 5a + 5b = 5c. | 5c. $ | 12,580.00 |

1

2                                      **EXHIBIT "3"**

3                                      [Claims Register]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Central District of California
# Claims Register

## 2:25-bk-12827-BB CPIF LA Arts District LLC, a Washington limited li

**Judge:** Sheri Bluebond　　**Chapter:** 11

**Office:** Los Angeles　　**Last Date to file claims:**

**Trustee:**　　**Last Date to file (Govt):**

---

| | |
|---|---|
| *Creditor:*　(42589340)<br>AIG Property Casualty, Inc.<br>Kevin J. Larner, Authorized Representati<br>28 Liberty Street, Floor 22<br>New York, NY 10005 | **Claim No: 1**　　*Status:*<br>*Original Filed*　　*Filed by:* CR<br>*Date:* 07/28/2025　　*Entered by:* Dana Burgagni<br>*Original Entered*　　*Modified:*<br>*Date:* 07/28/2025 |

Amount claimed: $0.00

*History:*

Details　1-1　07/28/2025 Claim #1 filed by AIG Property Casualty, Inc., Amount claimed: $0.00 (Burgagni, Dana)

*Description:* (1-1) Unliquidated

*Remarks:*

---

| | |
|---|---|
| *Creditor:*　(42415562)　History<br>GREYHAWK COLYTON LENDER, LLC<br>c/o Matthew D. Pham, Esq.,<br>Allen Matkins<br>865 South Figueroa Street, Suite 2800<br>Los Angeles, CA 90017 | **Claim No: 2**　　*Status:*<br>*Original Filed*　　*Filed by:* AT<br>*Date:* 07/30/2025　　*Entered by:* Matthew D Pham<br>*Original Entered*　　*Modified:*<br>*Date:* 07/30/2025 |

Amount  claimed: $4491484.08

Secured claimed: $4491484.08

*History:*

Details　2-1　07/30/2025 Claim #2 filed by GREYHAWK COLYTON LENDER, LLC, Amount claimed: $4491484.08
(Pham, Matthew)

*Description:*

*Remarks:*

---

| | |
|---|---|
| *Creditor:*　(42415562)　History<br>GREYHAWK COLYTON LENDER, LLC<br>c/o Matthew D. Pham, Esq.,<br>Allen Matkins<br>865 South Figueroa Street, Suite 2800<br>Los Angeles, CA 90017 | **Claim No: 3**　　*Status:*<br>*Original Filed*　　*Filed by:* AT<br>*Date:* 07/30/2025　　*Entered by:* Matthew D Pham<br>*Original Entered*　　*Modified:*<br>*Date:* 07/30/2025 |

Amount  claimed: $5870465.84

Secured claimed: $5870465.84

*History:*

Details　3-1　07/30/2025 Claim #3 filed by GREYHAWK COLYTON LENDER, LLC, Amount claimed: $5870465.84
(Pham, Matthew)

*Description:*

*Remarks:*

# Claims Register Summary

**Case Name:** CPIF LA Arts District LLC, a Washington limited li
**Case Number:** 2:25-bk-12827-BB
**Chapter:** 11
**Date Filed:** 04/07/2025
**Total Number Of Claims:** 3

| | |
|---|---|
| **Total Amount Claimed\*** | $10361949.92 |
| **Total Amount Allowed\*** | |

\*Includes general unsecured claims

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

| | Claimed | Allowed |
|---|---|---|
| **Secured** | $10361949.92 | |
| **Priority** | | |
| **Administrative** | | |

---

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/26/2025 12:46:17 | | |
| **PACER Login:** | lnbyb1700 | **Client Code:** | 10840 |
| **Description:** | Claims Register | **Search Criteria:** | 2:25-bk-12827-BB Filed or Entered From: 9/5/2020 Filed or Entered To: 12/31/2025 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

1

2

**<u>EXHIBIT "4"</u>**

[Purchase Sale Agreement]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PURCHASE AND SALE AGREEMENT
### (459 Colyton Street, Los Angeles, California)

This Purchase and Sale Agreement (this "**Agreement**") is made as of September 12, 2025 (the "**Effective Date**"), between DTLA MGMT, CORP., a California corporation ("**Buyer**") and/or permitted assigns under <u>Section 18</u> below ("**Buyer**"), and CPIF LA ARTS DISTRICT, LLC, a Washington limited liability company ("**Seller**").

1.    <u>Purchase and Sale</u>.  Upon the terms and conditions set forth herein, Buyer agrees to buy from Seller and Seller agrees to sell to Buyer the improved real property located at 459 Colyton Street, Los Angeles, California (AIN# 5163-025-009; the "**Property**").  The Property includes:

(i)    the land legally described in <u>**Exhibit A**</u> attached hereto and all easements and rights appurtenant thereto (the "**Land**"),

(ii)    all buildings, fixtures and improvements on the Land (the "**Improvements**"),

(iii)    all personal property owned by Seller and located upon the Land or within the Improvements, including, without limitation, tenant finish materials, tools and supplies used in connection with the operation of the Property, but excluding personal property and fixtures owned by the tenants under the Tenant Leases (as defined below) (the "**Personal Property**"),

(iv)    all of Seller's right, title and interest in and to the leases and other agreements under which tenants occupy all or any portion of the Land and Improvements ("**Tenant Leases**"),

(v)    all of Seller's right, title and interest, if any, in and to all assignable service contracts, equipment leases, utility agreements, rights under bonds, and similar agreements relating to the operation of the Property that Seller agrees to assume or is obligated to assume in accordance with <u>Section 5.4</u> of this Agreement (the "**Assumed Contracts**"), and

(vi)    all assignable permits, plans and specifications for improvements, approvals, studies, surveys, warranties and other documents associated with the Land, Improvements, Personal Property, Tenant Leases, and Assumed Contracts.

2.    <u>Purchase Price</u>.  The purchase price for the Property (the "**Purchase Price**") shall be $12,500,000.00, which shall be adjusted at Closing pursuant to <u>Section 6.2</u> and as otherwise expressly provided in this Agreement. Seller and Buyer agree no portion of the Purchase Price will be allocated to Personal Property.

3.    <u>Earnest Money</u>.  Within three (3) business days of the Effective Date, Buyer shall deposit with Wilshire Escrow (Eric Shewfelt) (the "**Escrow Agent**") the amount of $375,000.00 as the earnest money deposit (the "**Earnest Money**"). The Earnest Money shall be held and disbursed as provided in this Agreement.  The Earnest Money shall be deposited by Escrow Agent into an interest-bearing account, with all interest remaining in escrow as part of the Earnest Money (for purposes hereof, all references to the Earnest Money shall include all accrued interest thereon).  If the Approval Notice (as defined below) is delivered or deemed delivered, the Earnest Money shall be non-refundable to Buyer, except as expressly set forth in this Agreement.  The Earnest Money shall be credited towards the cash portion of the Purchase Price at Closing. Notwithstanding anything in this Agreement to the contrary, One Hundred Dollars ($100.00) of the Deposit (the "**Independent Consideration**") shall be paid to Seller and considered completely nonrefundable to Buyer in all events, it being the intent of the parties to recognize that such amount has been bargained for and agreed to as independent consideration for Seller's execution and delivery of this Agreement.  Accordingly, all references in this Agreement to the return of the Deposit (or any portion thereof) to Buyer shall mean the return of the Deposit (or such applicable portion thereof)

less the Independent Consideration which shall be delivered to and retained by Seller as provided hereinabove.

4.    Title.

4.1    Title.  Buyer shall order a preliminary commitment for title insurance for the Property from Wilshire Escrow (Eric Shewfelt) (the "**Title Company**"), together with copies of all exceptions and encumbrances noted thereon (collectively, the "**Preliminary Commitment**").  Buyer shall provide the Preliminary Commitment to Seller immediately upon receipt.

4.2    Survey.  All costs to update the existing survey (the "**Survey**") or recertify the Survey shall be the responsibility of Buyer. If Buyer elects to obtain a new Survey or update the existing Survey, Buyer shall initiate that order within five (5) days of the Effective Date and work diligently to promptly obtain the Survey.

4.3    Title and Survey Review.  Buyer shall have **thirty (30) days from and after the Effective Date** to advise Seller in writing of any encumbrances, restrictions, easements or other matters contained in the Preliminary Commitment or on the Survey (the "**Exceptions**") to which Buyer objects. All Exceptions to which Buyer does not object in writing within the 30-day period shall be deemed accepted by Buyer. If Buyer objects to any Exceptions within the 30-day period, Seller shall advise Buyer in writing within five (5) business days after Seller's receipt of Buyer's objections (a) which Exceptions Seller will remove at Closing, (b) which Exceptions the Title Company has agreed to insure over in the title policy to be issued at Closing ("**Title Policy**") (together with the proposed form of endorsement) and (c) which Exceptions will not be removed or insured over. On or before expiration of the Review Period (defined below), and assuming Seller has not agreed to remove all exceptions to which Buyer objects, Buyer shall notify Seller in writing of Buyer's election to either (a) terminate this Agreement, in which event the Earnest Money shall be returned to Buyer, or (b) waive its objections to the Exceptions the Title Company has agreed to insure over and the Exceptions Seller will not remove or insure around, in which event such Exceptions shall be deemed accepted by Buyer.  Failure of Buyer to terminate this Agreement prior to expiration of the Review Period shall constitute Buyer's waiver of its objections to the Exceptions to which Seller has indicated in subparagraph (c) it will not remove or insure over.

4.4    Title Insurance.  Seller shall cause Title Company, at Seller's cost, to deliver to Buyer at Closing an Owner's Standard Coverage policy of title insurance issued by Title Company in the face amount of the Purchase Price, dated the date of Closing, insuring Buyer's title subject to no exceptions other than the standard printed exceptions and the Exceptions deemed accepted by Buyer pursuant to Section 4.3 above (collectively, the "**Permitted Exceptions**").   Notwithstanding the foregoing, the Permitted Exceptions shall not include any exceptions noted in the Preliminary Commitment for any financing previously obtained by Seller, or other monetary liens, and Seller shall cause such Seller monetary encumbrances to be removed from the final policy on or before Closing. The policy of title insurance shall also include the endorsements Title Company agreed to provide in accordance with Section 4.3 above and such other endorsements as Buyer may reasonably request.  The cost of any endorsements requested by Buyer, and the cost of extended coverage (if elected by Buyer to obtain) shall be paid by Buyer. If Buyer elects to obtain extended title coverage, Buyer shall be responsible to have prepared and delivered to the Title Company an ALTA survey of the Property, at Buyer's expense.

5.    Review of Property.

5.1    Review Period.  Buyer shall have until 5:00 p.m. Pacific Time on the date that is forty-five (45) days after the Effective Date (the "**Review Period**") to conduct a due diligence and

feasibility review with respect to the Property and to satisfy itself with respect to all matters relating to the Property, including, without limitation, its physical condition, and to confirm that Buyer has financing available to purchase the Property. In the event that on or prior to the end of the Review Period, Buyer determines that the Property is not acceptable or financing is not available (in Buyer's sole and absolute discretion), Buyer may give written notice thereof (the "**Disapproval Notice**") to Seller prior to the end of the Review Period, in which event (i) this Agreement shall terminate; (ii) Buyer shall promptly return to Seller or destroy copies of all materials and documents provided by Seller to Buyer as part of Buyer's review of the Property; (iii) all of Buyer's studies, reports and work product with respect to the Property prepared by third parties and related to the physical condition of the Property or any governmental requirements applicable to the use and development of the Property shall be immediately delivered to Seller at no cost to Seller; and (iv) the Earnest Money shall be returned to Buyer. If Buyer deems the Property acceptable on or prior to the end of the Review Period, Buyer shall deliver to Seller written notice waiving the Review Period, as it may be extended pursuant to Section 5.2 below (the "**Approval Notice**"), this Agreement shall remain in full force and effect in accordance with the terms hereof and the Earnest Money shall become nonrefundable to Buyer except as expressly set forth in this Agreement. If Buyer does not timely deliver a Disapproval Notice, Buyer shall be deemed to have delivered an Approval Notice. Prior to the Effective Date, Seller made available in a data room for Buyer's review certain documents that relate to the Property (collectively, "**Seller Due Diligence Deliverables**"). Seller makes no representation or warranty as to the completeness or accuracy of the Seller Due Diligence Materials.   Buyer shall rely exclusively upon its own independent investigation and evaluation of every aspect of the Property and not on any Seller Due Diligence Materials supplied by Seller.  Buyer acknowledges and understands that the Seller Due Diligence Materials may have been prepared by third parties.  Buyer further acknowledges and agrees that Seller shall not have any liability whatsoever pertaining to any Seller Due Diligence Materials or any information delivered or made available to Buyer.  Buyer acknowledges that the Seller Due Diligence Materials delivered or otherwise made available to Buyer are not intended to be all inclusive or exhaustive, and Seller does not represent or warrant that such information is all of the information and materials that Buyer should review and evaluate in connection with the Property.  If for any reason Closing does not occur, (i) Buyer shall promptly return to Seller or destroy copies of all materials and documents provided by Seller to Buyer as part of Buyer's review of the Property; and (ii) all of Buyer's studies, reports and work product with respect to the Property prepared by third parties and related to the physical condition of the Property or any governmental requirements applicable to the use and development of the Property shall be immediately delivered to Seller at no cost to Seller.

    5.2    <u>Access</u>.  Prior to Closing, and upon twenty-four (24) hours prior notice to Seller and subject to any rights of tenants under the Tenant Leases, Buyer and its consultants, advisors, agents and representatives (collectively, "**Buyer Representatives**") shall be entitled to access the Property and to review the Seller Due Diligence Deliverables and to conduct such investigations, tests, surveys and other analyses as Buyer determines is necessary (collectively, the "**Investigations**"), provided (a) Buyer shall conduct the Investigations so as not to unreasonably interfere with current activities or tenants on the Property, and (b) Buyer shall promptly restore the Property to substantially the same condition which existed prior to any Investigations, at Buyer's sole cost and expense.  Seller shall be entitled to have a representative present at all times while Buyer or its representatives or agents are physically on the Property. The Investigations shall be at Buyer's sole risk, cost, and expense and any Investigations at the Property shall be conducted between 8:00 AM and 5:00 PM Monday through Friday, unless Seller otherwise directs or approves in writing. Notwithstanding anything to the contrary herein, no Investigations involving material physical disturbance, invasive testing, or other sampling of any kind (collectively, "**Invasive Testing**") shall be conducted without Seller's prior written approval, in Seller's sole discretion. Buyer shall not provide to Seller any environmental assessments or other reports obtained relating to Invasive Testing, or the contents thereof, unless expressly requested by Seller in writing. After the Effective Date, Buyer shall have the right to interview the tenants of the Property provided Seller is copied on any and all correspondence with such parties and only if a Seller representative participates in any phone call or meeting between Buyer and such tenant.

     5.3    <u>Inspection Indemnity; Insurance</u>.  Buyer shall indemnify, defend and hold Seller and its partners, shareholders, officers, managers, directors, employees, agents, representatives, and all tenants and occupants of the Property, (each, an "**Indemnified Party**") harmless from and against any and all liens, claims, causes of action, damages, liabilities and expenses (including reasonable attorneys' fees) relating to damages to persons or property to the extent arising out of any activity undertaken by Buyer or Buyer Representatives, including, without limitation, the Investigations permitted under this Agreement; provided, however, that Buyer shall have no responsibility or liability for, and this indemnity shall not extend to protect an Indemnified Party from (i) any adverse condition or defect on or affecting the Property not caused by Buyer or Buyer Representatives (unless exacerbated by Buyer or Buyer Representatives), including, without limitation, any pre-existing liabilities for matters merely discovered by Buyer (*e.g.*, latent environmental contamination), (ii) the acts of an Indemnified Party, and/or (iii) the results or findings of any Investigations.  The provisions of this <u>Section 5.3</u> shall survive the termination of this Agreement.  Buyer shall, at its cost and expense, maintain (and cause the Buyer Representatives to maintain, as appliable): (a) Statutory Worker's Compensation insurance (including occupational disease) as required in accordance with applicable law, (b) Employer's Liability insurance in an amount not less than $1,000,000 per accident or disease, (c) Commercial General Liability insurance (including products/completed operations, advertising liability and contractual liability insurance) providing coverage on an occurrence basis for bodily injury, personal injury and property damage liability with combined single limits of not less than $2,000,000 per occurrence, and $5,000,000 in the aggregate, and (d) Commercial Business Automobile Liability Insurance including coverage for all owned (if applicable), non-owned, leased and hired vehicles providing coverage for bodily injury and property damage liability with combined single limits of not less than $2,000,000 per occurrence.  Each of the foregoing insurance coverages shall (i) include an endorsement naming Seller as additional insured and extending the coverage thereunder to include the contractual liability of any Buyer Representative arising by reason of this Agreement or any order, and (ii) be primary and non-contributory to any other insurance maintained by Seller. Prior to any entry on the Property, Buyer must provide Seller an ACORD certificate of insurance evidencing the required coverage and naming Seller as an additional insured. Notwithstanding anything to the contrary contained in this Agreement, the provisions of this <u>Section 5.3</u> shall survive the termination, expiration or consummation of this Agreement.

     5.4    <u>Service Contracts</u>.  During the Review Period, Buyer shall notify Seller in writing of the contracts applicable to the Property which Buyer does not wish to assume at Closing (the "**Non-Assumed Contracts**").  All other such contracts shall constitute Assumed Contracts and will be assumed by Buyer at Closing. Seller shall pay any termination or cancellation fees on the Non-Assumed Contracts, if applicable. Notwithstanding the immediately preceding sentence, Seller shall not be required to terminate those contracts, if any, that require payment to the vendor upon early termination of a fee, penalty or other charge and any such contracts shall be Assumed Contracts, unless Buyer elects in writing to have Seller terminate such contracts at Buyer's sole cost and expense.  Any property management contracts or asset management contracts on the Property shall be terminated at Closing.

    6.    <u>Closing</u>.

     6.1    <u>Time and Place of Closing</u>.  Closing shall occur in the office of Escrow Agent on the date that is the later of: (a) ninety (90) days after the Effective Date and (b) fifteen (15) days after entry of an order of the Bankruptcy Court (as defined below) approving the transaction contemplated by this Agreement. On or prior to the date scheduled for Closing, Buyer and Seller shall deposit in escrow with Escrow Agent all instruments and documents necessary to complete the transaction in accordance with this Agreement.  As used herein, "**Closing**" or "**date of Closing**" or "**Closing Date**" means the date on which all appropriate documents are recorded and the proceeds of sale are available for disbursement to Seller.

6.2    <u>Closing Costs; Fees.</u>

(a)    <u>Seller's Closing Costs</u>.    At Closing, Seller shall pay (i) the cost of preparing the Deed (as defined below), (ii) real estate excise/transfer taxes; (iii) one-half of Escrow Agent's escrow fees and charges, if any, and (ii) that portion of the Title Policy premium for ALTA owner's standard coverage.

(b)    <u>Buyer's Closing Costs</u>.    At Closing Buyer shall pay (i) any additional Title Policy premium for ALTA owner's extended coverage and any title endorsements requested by Buyer and any costs relating to Buyer's lender's title policy; (ii) any personal property sales taxes; (iii) one-half of Escrow Agent's escrow fees and charges, if any, (iv) the cost of any updates or recertification of the Survey or to obtain a new Survey, and (v) all recording fees of the Deed, and any mortgages, deeds of trust, financing statement or similar documents relating to Buyer's financing of the purchase of the Property.

(c)    <u>Fees</u>.    Each party shall be responsible for its own legal, accounting and consultant fees. Any closing costs not specifically allocated herein shall be paid pursuant to local custom.

6.3    <u>Prorations</u>.    All income and expenses in connection with the operation of the Property shall be apportioned as of 12:01 a.m. on the date of Closing, as if Buyer were vested with title to the Property during the entire date of Closing, such that Buyer shall have the benefit of the income and the burden of expenses for the date of Closing.    Such prorated items shall include, without limitation, the following: real property taxes and assessments, utilities, payments under the Assumed Contracts, other expenses of the operation and maintenance of the Property and collected rents under the Tenant Leases. By way of clarification, operating costs and expenses shall be prorated based on the actual amounts of such expenses incurred and accrued up to the Closing Date, without further proration or adjustment for, or based on, post-closing expenses incurred by Buyer after the Closing Date. Any rental delinquencies paid after Closing shall be applied first to current delinquent rents for the month of Closing, then to delinquent rents owed to Seller for the period before Closing, and then to delinquent rents owed to Buyer for the period after the month of Closing.    All unapplied security deposits and prepaid items shall be transferred to Buyer in cash at Closing or credited against the Purchase Price.    With respect to specific services, which are collected by Buyer after the Closing Date but relate to the foregoing specific services rendered by Seller at Seller's cost and expense prior to the Closing Date, Buyer shall cause such collected amounts to be promptly paid to Seller.    After Closing, Seller shall have the right to enforce the rights of the lessor or landlord under the Tenant Leases prior to the Closing Date or to pursue a tenant for delinquent rent owed prior to the Closing Date. The prorations and adjustments under this <u>Section 6.3</u> shall also take into account operating expenses, CAM charges, taxes, assessments, and other charges that are billed and passed through to tenants, based upon the expense pass through provisions of the applicable Tenant Leases. Any revenue or expense amount which cannot be ascertained with certainty as of Closing shall be prorated based upon the parties' reasonable estimation, and shall be reconciled within sixty (60) days of Closing or as soon thereafter as the precise amounts can be ascertained.    Either party owing the other party money based upon the final reconciliation shall promptly pay it to the other party, which amount shall bear interest at the rate of twelve (12%) per annum from the date thirty (30) days after written demand for such payment is made by the party entitled to such payment.

7.    <u>Deliveries at Closing</u>.

7.1    <u>Seller's Delivery</u>.    At Closing, Seller shall deliver the following:

(a)    Grant Deed, in form attached hereto as **Exhibit B**, conveying title to the Land and Improvements to Buyer, subject to no encumbrances, claims and defects other than (i) the rights of tenants, as tenants only, under any Tenant Leases and any new leases entered into prior to Closing in accordance with the terms of this Agreement, if any, (ii) the lien of real estate taxes and assessments not yet due and payable, and (iii) the Permitted Exceptions (the "**Deed**").

(b)    A California Form 593-C duly executed by Seller, as and to the extent prescribed by California law.

(c)    All transfer tax statements, declarations and filings as may be necessary or appropriate for purposes of recording the deed.

(d)    Bill of Sale, in form attached hereto as **Exhibit C**, conveying title to the Personal Property to Buyer.

(e)    Assignment and Assumption of Tenant Leases, in form attached hereto as **Exhibit D**, transferring the Tenant Leases to Buyer.

(f)    Assignment and Assumption of Contracts, in form attached hereto as **Exhibit E** transferring the Contracts to Buyer.

(g)    FIRPTA Affidavit.

(h)    All prepaid rents and refundable security deposits under the Tenant Leases (unless credited against the Purchase Price), if any.

(i)    A final closing statement, prepared by Escrow Agent (the "**Closing Statement**").

(j)    Order of the Bankruptcy Court approving the transaction contemplated by this Agreement.

(k)    Estoppel certificates to the extent they are delivered to Seller by tenants under the Tenant Leases (and with respect to which Seller agrees to use commercially reasonable efforts to obtain such estoppel certificates).

(l)    Such other instruments as are reasonably required by the Tile Company to close the escrow and consummate the purchase of the Property in accordance with the terms hereof.

7.2    <u>Buyer's Delivery</u>.  At Closing, Buyer shall deliver the following:

(a)    Cash in the amount of the Purchase Price (subject to adjustments and prorations as set forth herein and with a credit for the Earnest Money).

(b)    A counterpart of any required transfer tax statements, declarations and filings.

(c)    A counterpart of the Assignment and Assumption of Tenant Leases.

(d)    A counterpart of the Assignment and Assumption of Contracts.

(e)    A counterpart of the Closing Statement.

(f)    Such other instruments as are reasonably required by the Tile Company to close the escrow and consummate the purchase of the Property in accordance with the terms hereof.

8.    <u>Operations Pending Closing</u>.  From the date of this Agreement until Closing, Seller agrees to manage and operate the Property free from physical waste and neglect and consistent with current management practices.  Seller further agrees:  (i) to maintain the Property in its current condition and repair (normal wear and tear and casualty loss excepted); (ii) to maintain the existing property and casualty insurance on the Property; (iii) to perform all of its material obligations under any existing licenses, permits, Tenant Leases, and Contracts applicable to the Property; and (iv) to not enter into any new contracts or leases without the approval of Buyer, which approval shall not be unreasonably withheld, conditioned or delayed.

9.    <u>Destruction/Condemnation of Property</u>.  In the event that all or any material portion of the Property is damaged or destroyed by any casualty or is the subject of a taking or condemnation under the provisions of eminent domain prior to the date of Closing, then Seller shall promptly notify Buyer of the same, in writing, whereupon Buyer may terminate this Agreement, the entire Earnest Money shall be refunded to Buyer and the parties will have no further obligations to each other except for those obligations that expressly survive termination of this Agreement.  If Buyer does not elect to terminate this Agreement within 10 days of the date that Seller provides Buyer with notice of the taking or damage to the Property, or if the taking or damage is not material, then Seller shall have no obligation to repair or replace any damage or destruction (other than to safeguard the Property against damage from the elements, as reasonably determined by Seller) caused by the foregoing nor shall the Purchase Price be reduced, but the following shall apply at the Closing: (i) in the event of a casualty, Buyer shall receive an assignment of the proceeds of any casualty insurance otherwise payable to Seller less any costs or premiums paid by Seller; and (ii) in the event of a taking, Seller shall assign to Buyer its rights to any condemnation proceeds resulting from such taking (less any reasonable costs incurred by Seller) and shall not make any settlements without Buyer's prior written approval.  For purposes hereof, damage is material if the reasonable estimated cost of repair exceeds ten percent (10%) of the Purchase Price.

10.    <u>Buyer's Authority</u>.  Buyer represents and warrants to Seller that this Agreement has been duly authorized, executed and delivered by Buyer and is a valid and binding obligation of Buyer.  Buyer represents and warrants that it is validly existing and in good standing under the laws of the State of California and qualified to do business in California, with full power and authority to enter into and comply with the terms of this Agreement.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will:  (i) be in violation of Buyer's organizational documents, (ii) conflict with or result in a breach of any law, regulation, writ, injunction or decree of any court or governmental instrumentality applicable to Buyer; or (iii) constitute a breach of any agreement to which Buyer is a party or by which Buyer is bound.

11.    <u>Seller's Representations and Warranties</u>. Seller represents and warrants to Buyer that:

(a)    Seller is a limited liability company organized and validly existing under the laws of the state of Washington.  Seller is fully authorized to own and operate the Property in the manner in which the Property is currently operated.  This Agreement has been duly authorized, executed and delivered by Seller and is a valid and binding obligation of Seller.  Subject to any consents or authorizations contemplated in this Agreement, including, without limitation, approval of the Bankruptcy Court presiding over Seller's Bankruptcy Case, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will:  (i) be in violation of Seller's organizational documents, (ii) conflict with or result in a breach of any law, regulation, writ, injunction or decree of any court or governmental instrumentality applicable to Seller; or (iii) constitute a breach of any agreement to which Seller is a party or by which Seller bound.

(b)  Except for any matters disclosed to Buyer in writing, or in the Seller Due Diligence Deliverables, or as may be disclosed in the Title Commitment, Seller has received no written notice of any pending litigation, condemnation, investigation or other legal proceeding against Seller, the Property or any portion thereof, and to Seller's knowledge, there are no actions, suits, proceedings, orders, administrative proceedings or investigations pending against Seller or the Property, which might materially and adversely affect any of the following:  (i) Seller's performance under this Agreement; (ii) Buyer's ability to continue the present operations on the Property as currently conducted; and there are no pending any public improvements in, about, or outside the Property which have resulted in or might result in the imposition of any assessment, lien, or charge against Seller or the Property.

(c)  Seller is not a party to any contract, agreement, or commitment to sell, convey, assign, transfer or otherwise dispose of any portion of the Property, except for this Agreement or as otherwise may be shown in the Title Commitment. Seller has not granted any rights of first refusal or similar agreements to any third parties in connection with the Property.

(d)  Seller is a debtor and debtor in possession in a Chapter 11 bankruptcy case (Case No. 2:25-bk-12827) pending in the Bankruptcy Court for the Central District of California ("**Bankruptcy Case**"), and therefore required to obtain approval of the Bankruptcy Court presiding over the Bankruptcy Case for the transaction contemplated by this Agreement.  Except relating to matters concerning the Bankruptcy Case, no petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or State bankruptcy laws is pending, or to the knowledge of Seller, threatened, against Seller;

(e)  Seller is not a "foreign person," as such term is defined in Section 1445 of the Code, and the sale of the Property is not subject to the federal income tax withholding requirements of such section of the Code.

(f)  Except for any matters disclosed to Buyer in writing, or in the Seller Due Diligence Deliverables, Seller has not received any written notice from any governmental agency requiring the correction of any condition with respect to the Property, or any part thereof, by reason of a material violation of any applicable federal, state, county or municipal law, code, rule or regulation (including environmental laws) that has not been cured or waived.

(g)  Seller is not a person or entity that and shall not be a person or entity that:  (i) is acting, directly or indirectly, on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any of the applicable lists issued by the Office of Foreign Assets Control; (ii) resides or has a place of business in a country or territory named on any of such lists or which is designated as a Non-Cooperative Jurisdiction by Financial Action Task Force; (iii) is a "Foreign Shell Bank" within the meaning of the USA Patriot Act; or (iv) resides in or is organized under the laws of a jurisdiction designated by the U.S. Secretary of the Treasury under Sections 311 or 312 of the USA Patriot Act as warranting special measures due to money laundering concerns.

(h)  For purposes hereof, "**Seller's knowledge**" shall mean and be limited to the current actual knowledge of Robert Barnes, without duty of inquiry or imputation of knowledge.  The named individual is acting for and on behalf of Seller in a representative capacity and is in no manner expressly or impliedly making any representations or warranties in an individual capacity. The foregoing representations and warranties shall survive Closing for a period of nine (9) months, and any action for breach of a representation or warranty must be commenced, if at all, within such nine (9) month period.

(i)    Notwithstanding anything to the contrary contained herein, no claim for a breach of any representation or warranty of Seller shall be actionable or payable if the breach in question results from or is based on a condition, state of facts or other matter which is actually known to Buyer prior to Closing.

12.    <u>As-Is Purchase; Release</u>.

12.1    EXCEPT    (i) FOR    THE    REPRESENTATIONS,    WARRANTIES, ACKNOWLEDGMENTS, OR AGREEMENTS EXPRESSLY SET FORTH IN SECTION 11 OF THIS AGREEMENT OR IN ANY OF THE DOCUMENTS DELIVERED BY SELLER AT CLOSING PURSUANT TO SECTION 7.1 OF THIS AGREEMENT, AND ANY FRAUD OR WILLFUL MISCONDUCT BY SELLER, AND (ii) FOR THE WARRANTY OF TITLE SET FORTH IN THE DEED ("**AS-IS EXCEPTIONS**"), BUYER IS PURCHASING THE PROPERTY "AS IS WHERE IS" IN ITS PRESENT CONDITION, SUBJECT TO "ALL FAULTS," INCLUDING BUT NOT LIMITED TO BOTH LATENT AND PATENT DEFECTS, AND BUYER HEREBY WAIVES ALL WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE CONDITION AND USE OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. BUYER HAS HAD OR WILL HAVE THE OPPORTUNITY TO INSPECT THE PROPERTY AND DOCUMENTATION IN SELLER'S POSSESSION AS PROVIDED HEREIN.    EXCEPT FOR THE AS-IS EXCEPTIONS, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO, AND SHALL HAVE NO LIABILITY FOR:  (A) THE CONDITION OF THE PROPERTY OR ANY BUILDINGS, STRUCTURE OR IMPROVEMENTS THEREON OR THE SUITABILITY OF THE PROPERTY FOR HABITATION OR FOR BUYER'S INTENDED USE; (B) ANY APPLICABLE BUILDING, ZONING OR FIRE LAWS OR REGULATIONS OR WITH RESPECT TO COMPLIANCE THEREWITH, INCLUDING WITHOUT LIMITATION, LAWS OR REGULATIONS CONCERNING THE AMERICANS WITH DISABILITIES ACT, OR WITH RESPECT TO THE EXISTENCE OF OR COMPLIANCE WITH ANY REQUIRED PERMITS, IF ANY, OF ANY GOVERNMENTAL AGENCY; (C) THE AVAILABILITY OR EXISTENCE OF ANY WATER, SEWER OR UTILITIES, ANY RIGHTS THERETO, OR ANY WATER, SEWER OR UTILITY DISTRICTS; (D) ACCESS TO ANY PUBLIC OR PRIVATE SANITARY SEWER OR DRAINAGE SYSTEM; OR (E) THE PRESENCE OF ANY HAZARDOUS SUBSTANCES (DEFINED BELOW) AT THE PROPERTY OR IN ANY IMPROVEMENTS ON THE PROPERTY OR THE DISPOSAL OR EXISTENCE, IN, ON, OR UNDER THE PROPERTY, OF ANY HAZARDOUS SUBSTANCE, AS DEFINED BY ENVIRONMENTAL LAWS (DEFINED BELOW).    WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT FOR THE AS-IS EXCEPTIONS, SELLER SHALL HAVE NO LIABILITY WITH RESPECT TO THE CONDITION OF THE PROPERTY UNDER COMMON LAW, OR ANY FEDERAL, STATE, OR LOCAL LAW OR REGULATION, INCLUDING BUT NOT LIMITED TO ENVIRONMENTAL LAWS. BUYER ACKNOWLEDGES THAT BUYER IS BEING GIVEN THE OPPORTUNITY UNDER THIS AGREEMENT TO FULLY INSPECT THE PROPERTY AND, EXCEPT FOR THE AS-IS EXCEPTIONS, BUYER ASSUMES THE RESPONSIBILITY AND RISKS OF ALL DEFECTS AND CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUCH DEFECTS AND CONDITIONS, IF ANY, THAT CANNOT BE OBSERVED BY CASUAL INSPECTION AND/OR THAT EXISTED AT THE PROPERTY PRIOR TO THE CLOSING DATE. BUYER IS A SOPHISTICATED BUYER WHO IS FAMILIAR WITH THE OWNERSHIP AND OPERATION OF REAL ESTATE PROJECTS SIMILAR TO THE PROPERTY AND  BUYER HAS OR WILL HAVE ADEQUATE OPPORTUNITY TO COMPLETE ALL PHYSICAL AND FINANCIAL    EXAMINATIONS    (INCLUDING    WITHOUT    LIMITATION    ALL    OF    THE EXAMINATIONS, REVIEWS AND INVESTIGATIONS REFERRED TO IN THIS AGREEMENT) RELATING TO THE ACQUISITION OF THE PROPERTY HEREUNDER IT DEEMS NECESSARY, AND WILL ACQUIRE THE PROPERTY SOLELY ON THE BASIS OF AND IN RELIANCE UPON

SUCH EXAMINATIONS AND THE TITLE INSURANCE PROTECTION AFFORDED BY THE TITLE POLICY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER (EXCEPT FOR THE AS-IS EXCEPTIONS). AS USED HEREIN, "HAZARDOUS SUBSTANCES" MEANS ANY AND ALL HAZARDOUS, TOXIC OR RADIOACTIVE SUBSTANCE, WASTE, OR MATERIAL, INCLUDING WITHOUT LIMITATION PETROLEUM OIL AND ITS FRACTIONS, LISTED OR DEFINED BY APPLICABLE ENVIRONMENTAL LAWS (DEFINED BELOW) AND INCLUDING ANY HYDROCARBONOUS SUBSTANCES, POLYCHLORINATED BIPHENYLS, OR ANY OTHER HAZARDOUS OR TOXIC SUBSTANCES, WASTES OR MATERIALS, MOLD, ASBESTOS OR ASBESTOS-BEARING MATERIALS OR OTHER CHEMICAL SUBSTANCE OR MATERIAL WHICH IS PROHIBITED, LIMITED OR REGULATED UNDER ANY APPLICABLE LAW REGULATING, RELATED TO OR IMPOSING LIABILITY OR STANDARDS CONCERNING MATERIALS OR SUBSTANCES AND KNOWN OR SUSPECTED TO BE TOXIC OR HAZARDOUS TO HEALTH AND SAFETY, THE ENVIRONMENT OR NATURAL RESOURCES.  AS USED HEREIN, "ENVIRONMENTAL LAWS" MEANS ANY AND ALL APPLICABLE FEDERAL, STATE AND LOCAL STATUTES, REGULATIONS, ORDINANCES AND RULES, INCLUDING WITHOUT LIMITATION THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, AND CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 25117 AND 25316, AS PRESENTLY EXISTING OR AS MAY BE AMENDED OR ADOPTED IN THE FUTURE, PERTAINING TO THE PROTECTION OF HUMAN HEALTH AND/OR THE ENVIRONMENT AND/OR CONCERNING THE PRESENCE, USE, PRODUCTION, GENERATION, HANDLING, TRANSPORTATION, TREATMENT, STORAGE, DISPOSAL, DISTRIBUTION, LABELING, TESTING, PROCESSING, DISCHARGE, EMISSION, RELEASE, THREATENED RELEASE, CONTROL, OR CLEANUP OF ANY HAZARDOUS SUBSTANCES.  EXCEPT FOR THE AS-IS CONDITIONS, BUYER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS, AND THAT SELLER HAS NO OBLIGATIONS TO MAKE REPAIRS, REPLACEMENTS OR IMPROVEMENTS.

12.2    ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY IS SOLELY FOR BUYER'S CONVENIENCE AND WAS OR WILL BE OBTAINED FROM A VARIETY OF SOURCES.  SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO (AND EXPRESSLY DISCLAIMS ALL) REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.  SELLER SHALL NOT BE LIABLE FOR ANY MISTAKES, OMISSIONS, MISREPRESENTATIONS OR ANY FAILURE TO INVESTIGATE THE PROPERTY NOR SHALL SELLER BE BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS, APPRAISALS, ENVIRONMENTAL ASSESSMENT REPORTS, OR OTHER INFORMATION PERTAINING TO THE PROPERTIES OR THE OPERATION THEREOF, FURNISHED BY SELLER OR BY ANY MANAGER, MEMBER, PARTNER, OR AGENT OF SELLER.

12.3    UPON CLOSING, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS DELIVERED BY SELLER AT CLOSING AS SET FORTH IN SECTION 7.1 AND WITH RESPECT SOLELY TO SELLER AND THE SELLER'S DIRECT OR INDIRECT PARTNERS, SHAREHOLDERS, OWNERS OR AFFILIATES, ANY OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF THE FOREGOING, OR ANY AFFILIATE OR CONTROLLING PERSON THEREOF (COLLECTIVELY WITH SELLER, "**SELLER PARTIES**"), BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS RELATED TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL OR CONSTRUCTION DEFECTS OR ADVERSE ENVIRONMENTAL, HEALTH OR SAFETY CONDITIONS, MAY NOT

HAVE BEEN REVEALED BY BUYER'S INSPECTIONS AND INVESTIGATIONS. UPON CLOSING, TO THE FULLEST EXTENT PERMITTED BY LAW, BUYER WILL FOREVER RELEASE AND DISCHARGE SELLER AND EACH OF THE SELLER PARTIES FROM ALL RESPONSIBILITY AND LIABILITY WITH RESPECT TO THE PROPERTY.

12.4    BUYER'S RELEASE, WAIVER, AND INDEMNIFICATION. EXCEPT FOR THE EXCLUDED CLAIMS (DEFINED BELOW), BUYER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, RELEASES, ACQUITS, AND FOREVER DISCHARGES THE SELLER PARTIES FROM AND AGAINST ANY AND ALL RIGHTS, CLAIMS, THIRD PARTY CLAIMS, LOSSES, DAMAGES, ACTIONS, DEMANDS, LIABILITIES, COSTS AND EXPENSES, INCLUDING, BUT NOT LIMITED TO, ATTORNEYS' FEES, EXPERT FEES AND COURT COSTS WHICH HAVE ARISEN OR MAY ARISE IN THE FUTURE WITH RESPECT TO THE PROPERTY, REGARDLESS OF WHETHER BUYER OR THE SELLER PARTIES ARE PRESENTLY AWARE OF ANY SUCH MATTERS, INCLUDING, WITHOUT LIMITATION, ANY CONTRIBUTION CLAIMS, INDEMNITY RIGHTS AND OTHER RIGHTS AND CLAIMS OF BUYER UNDER COMMON LAW AND THE ENVIRONMENTAL LAWS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT FOR THE EXCLUDED CLAIMS, BUYER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, RELEASES, ACQUITS, AND FOREVER DISCHARGES THE SELLER PARTIES FROM (A) ALL REMEDIATION, CLEANUP, REMOVAL, MITIGATION, RESTORATION, RESPONSE, INVESTIGATION, MONITORING AND ALL OTHER TYPES OF COSTS AND EXPENSES (INCLUDING, BUT NOT LIMITED TO, ATTORNEYS' FEES, EXPERT FEES AND COURT COSTS) ARISING FOR ANY REASON WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, THOSE ARISING UNDER COMMON LAW AND THE ENVIRONMENTAL LAWS, OR OTHERWISE AT LAW OR IN EQUITY, RELATING TO THE EXISTENCE AT ANY TIME OF ANY HAZARDOUS SUBSTANCES IN, ON, UNDER, OR ABOUT THE PROPERTY, (B) ALL CONTRIBUTION AND INDEMNITY RIGHTS AND CLAIMS THAT BUYER HAS OR MAY HAVE UNDER COMMON LAW AND THE ENVIRONMENTAL LAWS OR THAT ARE OTHERWISE AVAILABLE TO BUYER AT LAW OR IN EQUITY AGAINST ANY OF THE SELLER PARTIES RELATING TO ANY HAZARDOUS SUBSTANCES IN, ON, UNDER, OR ABOUT THE PROPERTY, AND (C) ALL CLAIMS RELATING TO THE PHYSICAL OR FINANCIAL CONDITION OF THE PROPERTY. SELLER SHALL BE UNDER NO OBLIGATION WHATSOEVER WITH RESPECT TO ANY HAZARDOUS SUBSTANCES LOCATED IN, ON, UNDER, OR ABOUT THE PROPERTY, REGARDLESS OF WHETHER SUCH HAZARDOUS SUBSTANCES EXISTED AT THE PROPERTY ON OR BEFORE THE CLOSING DATE. TO THE FULLEST EXTENT PERMITTED BY LAW, BUYER SHALL BEAR ALL LIABILITY AND RESPONSIBILITY WITH RESPECT TO ANY AND ALL HAZARDOUS SUBSTANCES IN, ON, UNDER OR ABOUT THE PROPERTY, AND BUYER SHALL INDEMNIFY, DEFEND AND HOLD SELLER HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LIABILITIES, LOSSES, DAMAGES, FINES, PENALTIES, COSTS, JUDGMENTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' AND CONSULTANTS' FEES AND COSTS) ARISING OUT OF RELATING TO: (1) THE PRESENCE, RELEASE, DISCHARGE, DISPOSAL, STORAGE OR HANDLING OF ANY HAZARDOUS SUBSTANCES IN, ON, UNDER OR ABOUT THE PROPERTY; (2) ANY VIOLATION OF ENVIRONMENTAL LAWS RELATED TO THE PROPERTY; (3) ANY REMEDIATION OR INVESTIGATIVE ACTION REQUIRED BY ANY ENVIRONMENTAL LAWS WITH RESPECT TO THE PROPERTY; AND (4) ANY MIGRATION OF HAZARDOUS SUBSTANCES TO OR FROM THE PROPERTY, REGARDLESS OF WHETHER ANY OF THE CONDITIONS IN (1)-(4) ABOVE AROSE BEFORE, ON, OR AFTER THE CLOSING DATE. EXCEPT WITH RESPECT TO THE EXCLUDED CLAIMS, IN NO EVENT SHALL THE SELLER PARTIES BE OBLIGATED TO INVESTIGATE, MONITOR, REMOVE, CLEANUP, MITIGATE, OR OTHERWISE REMEDIATE ANY HAZARDOUS SUBSTANCES AT ANY TIME LOCATED IN, ON, UNDER, OR ABOUT THE PROPERTY, OR TO PAY FOR ANY OF THE

FOREGOING, OR TO REIMBURSE OR INDEMNIFY, DEFEND OR HOLD HARMLESS BUYER
FOR ANY OF THE FOREGOING. THE FOREGOING COVENANTS OF BUYER AND
INDEMNITY OBLIGATIONS OF BUYER SHALL SURVIVE AND BE ENFORCEABLE IN
ACCORDANCE WITH THEIR TERMS FOLLOWING THE CLOSING OF THIS TRANSACTION
AND SHALL NOT BE MERGED WITH OR INTO THE DEED DELIVERED BY SELLER TO
BUYER THROUGH ESCROW AT THE CLOSING. EXCEPT FOR THE EXCLUDED CLAIMS,
BUYER ACKNOWLEDGES THAT BUYER HAS INVESTIGATED TO ITS SATISFACTION THE
GOVERNMENTAL REQUIREMENTS AND OTHER MATTERS OF A SIMILAR NATURE
AFFECTING THE USE AND CONDITION OF THE PROPERTY AND THE PHYSICAL
CONDITION OF THE PROPERTY (INCLUDING, BUT NOT LIMITED TO SUBSURFACE SOIL
AND WATER CONDITIONS), AND AGREES TO PURCHASE THE PROPERTY, SUBJECT TO
THE PROVISIONS CONTAINED HEREIN, IN THE CONDITION THAT IT IS IN AT THE
CLOSING. EXCEPT FOR THE EXCLUDED CLAIMS, BUYER ACKNOWLEDGES AND AGREES
THAT THE FOREGOING RELEASE AND WAIVER INCLUDES ALL RIGHTS AND CLAIMS OF
BUYER AGAINST THE SELLER PARTIES PERTAINING TO THE CONDITION OF THE
PROPERTY, WHETHER HERETOFORE OR NOW EXISTING OR HEREAFTER ARISING, OR
WHICH COULD, MIGHT, OR MAY BE CLAIMED TO EXIST, OF WHATEVER KIND OR
NATURE, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, LIQUIDATED
OR UNLIQUIDATED, WHICH IN ANY WAY ARISE OUT OF, OR ARE CONNECTED WITH, OR
RELATE TO, THE CONDITION OF THE PROPERTY. BUYER AND SELLER ACKNOWLEDGE
AND AGREE THAT THE FOREGOING RELEASE AND WAIVER DOES NOT APPLY TO ANY OF
BUYER'S RIGHTS UNDER THIS AGREEMENT. NOTWITHSTANDING ANYTHING TO THE
CONTRARY SET FORTH IN THIS AGREEMENT, THE FOREGOING WAIVER AND RELEASE IS
NOT INTENDED TO AND DOES NOT COVER (I) ANY CLAIMS ARISING FROM A BREACH OF
(X) SELLER'S REPRESENTATIONS OR WARRANTIES SET FORTH IN THIS AGREEMENT OR
(Y) ANY OF THE CLOSING DOCUMENTS, (II) ANY OTHER BREACH BY SELLER OF AN
OBLIGATION OF SELLER UNDER THIS AGREEMENT WHICH BY ITS TERMS SURVIVES THE
CLOSING, AND (III) ANY RIGHT BUYER MAY HAVE TO SEEK TO HAVE SELLER ADDED AS
AN ADDITIONAL DEFENDANT (THROUGH AN ACTION IN IMPLEADER, CONTRIBUTION OR
SIMILAR PROCEDURE) IN AN ACTION BROUGHT AGAINST BUYER OR ITS AFFILIATES BY
A THIRD PARTY AS A RESULT OF MATTERS ARISING PRIOR TO CLOSING IN ORDER TO
ESTABLISH ANY LIABILITY SELLER MAY HAVE TO SUCH THIRD PARTY, BUT ONLY TO
THE EXTENT SUCH CLAIMS RELATE TO CLAIMS FOR PERSONAL INJURY OR PERSONAL
PROPERTY DAMAGE WHICH OCCURRED AT THE PROPERTY PRIOR TO CLOSING (HEREIN
COLLECTIVELY THE "EXCLUDED CLAIMS").

   12.5 BUYER HEREBY ACKNOWLEDGES THAT IT HAS READ AND IS
FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 ("SECTION
1542"), WHICH IS SET FORTH BELOW:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> THAT THE CREDITOR OR RELEASING PARTY DOES NOT
> KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
> THE TIME OF EXECUTING THE RELEASE, AND THAT, IF
> KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
> AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
> OR RELEASED PARTY."

BY INITIALING BELOW, BUYER ACKNOWLEDGES THAT (A) BUYER HAS READ AND
FULLY UNDERSTANDS THE PROVISIONS OF THIS SECTION 12, (B) BUYER HAS HAD THE
CHANCE TO ASK QUESTIONS OF ITS COUNSEL ABOUT ITS MEANING AND SIGNIFICANCE,

(C) BUYER HAS ACCEPTED AND AGREED TO THE TERMS SET FORTH IN THIS SECTION 12; AND (D) BUYER HEREBY WAIVES THE PROVISIONS OF SECTION 1542 SOLELY IN CONNECTION WITH THE MATTERS WHICH ARE THE SUBJECT OF THE FOREGOING WAIVERS AND RELEASES.

Initial

**AH**

Buyer's Initials

12.6    THIS <u>SECTION 12</u> SHALL SURVIVE CLOSING AND DELIVERY OF THE DEED

13.    <u>Negotiation and Construction</u>.  This Agreement and each of the terms and provisions hereof are deemed to have been explicitly negotiated between the parties, and the language in all parts of this Agreement shall, in all cases, be construed according to its fair meaning and not strictly for or against either party.

14.    <u>Brokers and Finders</u>.    Buyer and Seller acknowledge and agree that Cushman & Wakefield – Mike Condon & Reid Gratsch ("**Seller's Broker**") represents Seller in this transaction and Alona Hassid ("**Buyer's Broker**") represents Buyer in this transaction.  Seller agrees that it shall pay Seller's Broker and Buyer's Broker a commission pursuant to a separate agreement and shall indemnify, defend and hold Buyer harmless from any claims for commissions or other compensation from Seller's Broker and Buyer's Broker.  In the event of a claim for broker's fee, finder's fee, commission or other similar compensation in connection with this Agreement other than as set forth above, (a) Buyer, if such claim is based upon any agreement alleged to have been made by Buyer, hereby agrees to indemnify Seller against any and all damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and costs) which Seller may sustain or incur by reason of such claim, and (b) Seller, if such claim is based upon any agreement alleged to have been made by Seller, hereby agrees to indemnify Buyer against any and all damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and costs) which Buyer may sustain or incur by reason of such claim.  Notwithstanding anything to the contrary herein, the provisions of this <u>Section 14</u> shall survive the termination of this Agreement or the Closing.

15.    <u>Possession</u>.  Buyer shall be entitled to possession of the Property on the date of Closing, subject only to the Tenant Leases.

16.    <u>Governing Law; Attorneys' Fees</u>.  This Agreement shall be construed according to the laws of the state of California.  If either Buyer or Seller should find it necessary to employ an attorney to enforce a provision of the Agreement or to recover damages for the breach hereof (including proceedings in bankruptcy), the prevailing party shall be entitled to be reimbursed for its court costs and attorneys' fees, in addition to all damages, through all levels of appeal. This section shall survive the early termination of this Agreement and the Closing Date.

17.    <u>Default and Remedies</u>.

17.1    <u>Default by Buyer</u>. In the event the close of escrow does not occur as herein provided by reason of any default of Buyer, Buyer and Seller agree that it would be impractical and extremely difficult to estimate the damages which Seller may suffer.  Therefore Buyer and Seller do hereby agree that a reasonable estimate of the total net detriment that Seller would suffer in the event that Buyer defaults and fails to complete the purchase of the Property is and shall be an amount equal to the Earnest Money, together with the accrued interest thereon; and, as Seller's sole and exclusive remedy

- 13 -

(whether at law or in equity), said amount shall be disbursed to Seller as the full, agreed and liquidated damages for a breach of this Agreement by Buyer which results in the close of escrow not occurring, all other claims to damages or other remedies in respect of Buyer's breach of this Agreement being herein expressly waived by Seller.  Such payment of the Earnest Money is not intended as a penalty, but as full liquidated damages.  Nothing contained in this <u>Section 17.1</u> shall limit Seller's right to receive reimbursement for costs and expenses pursuant to this Agreement, nor waive or affect Buyer's indemnity and confidentiality obligations. The payment of the Earnest Money as liquidated damages is not intended as a forfeiture or penalty within the meaning of California Civil Code Sections 3275 or 3369, but is intended to constitute liquidated damages to Seller pursuant to California Civil Code Sections 1671, 1676 and 1677.  NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL LIMIT SELLER'S REMEDIES AT LAW OR IN EQUITY AS TO THE SURVIVING TERMINATION OBLIGATIONS. THE PARTIES HAVE SET FORTH THEIR INITIALS BELOW TO INDICATE THEIR AGREEMENT WITH THE LIQUIDATED DAMAGES PROVISION CONTAINED IN THIS SECTION.

| _____ | _____ |
|:---:|:---:|
| Seller's Initials | Buyer's Initials |

17.2    <u>Default by Seller</u>.  If Seller fails without legal excuse to complete the sale of the Property in accordance with the terms of this Agreement, and such failure continues following five (5) days' written notice from Buyer, Buyer may elect one of the following remedies:   (a) specific performance of this Agreement (provided an action thereon is commenced with thirty (30) days of Seller's failure to perform), or (b) rescind this Agreement and obtain a refund of the Earnest Money.  Except as set forth in this Section, Buyer waives any right to seek any other remedies against Seller, including any equitable or legal remedies and specifically including any right to record or file a lis pendens or other similar notice of suit, and under no circumstance may Buyer seek or be entitled to recover any special, consequential, punitive, speculative or indirect damages, all of which Buyer specifically waives.

17.3    <u>Notices</u>. All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth below.  Any such notices shall, unless otherwise provided herein, be given or served (a) by depositing the same in the United States mail, postage paid, certified and addressed to the party to be notified, with return receipt requested, (b) by overnight delivery using a nationally recognized overnight courier, (c) by personal delivery, or (d) email, provided that if the recipient does not confirm receipt thereof, a confirmation copy shall be sent by another method permitted in this Section within 24 hours following transmission.  Notice deposited in the mail in the manner hereinabove described in item (a) shall be effective on earlier of actual receipt or the third (3rd) business day after such deposit, and item (b) shall be effective one (1) business day after depositing with such reputable overnight carrier. Notice given by electronic mail in accordance herewith shall be effective upon the entrance of such electronic mail into the information processing system designated by the recipient's electronic mail address, and notice by hand delivery shall be effective upon verified delivery or refusal thereof.  A party's address may be changed by written notice to the other party, provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Notices given by counsel to Buyer shall be deemed given by Buyer and notices given by counsel to Seller shall be deemed given by Seller.  For purposes of this Section, the addresses of each party shall be that set forth below the signature of such party hereto with a copy to the other addressees set forth below the signature of such party.

SELLER:                          CPIF LA Arts District, LLC
                                 c/o Columbia Pacific Advisors
                                 1910 Fairview Ave. East, Suite 200
                                 Seattle, Washington 98102
                                 Attention: Kevin Quinn & Chais Lowell
                                 Telephone: (206) 576-0082
                                 Email:  kevinQ@columbiapacific.com;
                                          chaisL@columbiapacific.com

With a copy to:                  Alston, Courtnage & Bassetti LLP
                                 600 University Street, Suite 2310
                                 Seattle, Washington 98101
                                 Attention:  Adam Coady
                                 Telephone: (425) 495-3281
                                 Email:  acoady@alcourt.com

BUYER:                           DTLA MGMT, CORP.
                                 1340 E 6th St,  #200
                                 Los Angeles, CA 90021
                                 Attention: Alona Hassid
                                 310.849.1409
                                 Email:  alonahassid@gmail.com

        17.4    Limitations.  Seller's warranties, representations and indemnities contained in this Agreement and in any document executed by Seller pursuant to this Agreement shall survive Buyer's purchase of the Property only for a period commencing on the Closing Date and ending on the date which is nine (9) months after the Closing Date (the "**Limitation Period**").  Seller's liability for breach of any such representations or warranty or under any such indemnity shall be limited to claims in excess of an aggregated $50,000 and Seller shall be liable only to the extent that such aggregate exceeds such figure.  Seller's aggregate liability for claims arising out of such representations, warranties and/or indemnities shall not exceed two percent (2%) of the Purchase Price. The Limitation Period referred to herein shall apply to unknown as well as known breaches and claims.  Except as specifically provided in this Agreement, none of Seller's representations, warranties, indemnities, covenants or agreements shall survive the Closing.  Buyer specifically acknowledges that such termination of liability represents a material element of the consideration to Seller.  The limitation as to Seller's liability in this Section 17.4 does not apply to the obligations of the parties with respect to prorations and adjustments under Section 6.3, which shall survive until the parties' satisfaction of their respective obligations under Section 6.3.

        18.    Assignment.  This Agreement shall not be assigned (directly or indirectly) by Buyer to any person or entity without the express written consent of Seller (such consent not to be unreasonably withheld conditioned or delayed) and any direct or indirect transfer of any beneficial or "**Controlling**" (as hereinafter defined) interest in Buyer prior to Closing shall constitute an attempted assignment of this Agreement, which attempted assignment shall be void if made without the written consent of Seller. Notwithstanding the preceding sentence, Buyer may assign this Agreement to a "**Permitted Assignee**" (as hereinafter defined) without Seller' prior consent, upon notice to Seller no later than five (5) business days prior to the Closing Date (provided the assignment itself may occur on or before the Closing Date). For purposes of this Section 18, "**Control**" "**Controlled**" and "**Controlling**" means, with respect to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the day-to-day management of such entity (subject to customary "material decision" rights of other direct or indirect

beneficial owners), through the ownership of voting securities, by contract or otherwise. "**Permitted Assignee**" means, an entity that Buyer is affiliated with through an ownership interest, or which manages and operates such entity's ownership interest, and that Buyer directly or indirectly Controls, is Controlled by or is under common Control with the Buyer. Notwithstanding any provision in this Agreement to the contrary, any permitted assignment by Buyer shall not relieve Buyer of any of its obligations and liabilities hereunder including obligations and liabilities which survive the Closing or the termination of this Agreement, nor shall any such assignment alter, impair or relieve such assignee from the waivers, acknowledgements and agreements of Buyer set forth herein. Any assignment of this Agreement from Buyer pursuant to this Section 18 below shall be to an individual or to a validly existing entity, in good standing under the laws of the State of its formation and qualified to do business in California. No consent given by Seller to any transfer or assignment of Buyer's rights or obligations hereunder shall be construed as a consent to any other transfer or assignment of Buyer's rights or obligations hereunder. No transfer or assignment in violation of the provisions hereof shall be valid or enforceable. Subject to the foregoing, this Agreement and the terms and provisions hereof shall inure to the benefit of and shall be binding upon the successors and assigns of the parties.

19.     Tax Deferred Exchange.  Either party may convey or receive a conveyance of the real property described herein as part of an IRC Section 1031 Tax Deferred Exchange. Either party may assign all contract rights and obligations hereunder to a qualified intermediary, as part of, and in furtherance of, such tax deferred exchange. In such event, the other party agrees to reasonably assist and cooperate in such exchange for the benefit of the exchanging party at no cost, expense or liability to the other party, and further agrees to execute documents (subject to the reasonable approval of the other party's legal counsel) as are reasonably necessary in connection with such exchange at the exchanging party's sole expense. Nothing contained in this Section 19 shall release the exchanging party of any of its obligations or liabilities under this Agreement, whether arising before, at or after Closing.

20.     Bankruptcy Court Approval.  As a debtor in possession in the Bankruptcy Case, and while the Bankruptcy Case is pending, Seller shall seek approval of the transaction contemplated by this Agreement from the Bankruptcy Court, which approval may be sought through a motion to approve sale transaction or confirmation of a plan of reorganization. Buyer shall cooperate with Seller's efforts to seek approval of this Agreement and the transaction contemplated hereunder. Notwithstanding anything to the contrary, Closing is expressly conditioned on receipt of the Bankruptcy Court approval and Seller shall have no obligation to close if such approval has not been obtained. In the event Seller has not obtained Bankruptcy Court approval within one hundred eighty (180) days after delivery or deemed delivery of the Disapproval Notice or Approval Notice, Buyer may terminate this Agreement upon written notice to Seller within two (2) business days after expiration of such 180-day period and Buyer shall obtain a refund of the Earnest Money.

21.     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs, administrators and assigns.

22.     Entire Agreement; Merger.  This Agreement contains the entire understanding between the parties and supersedes any prior agreements between them respecting the subject matter hereof. Except to the extent specifically set forth in this Agreement to the contrary, this Agreement shall be merged into the instruments and documents executed and delivered at Closing, and shall not survive Closing.

23.     Survival.  All provisions of this Agreement which involve obligations, duties or rights to be performed after the date of Closing or the recording of the Deed, and all representations, and warranties made in or to be made pursuant to this Agreement shall survive the date of Closing and/or the recording of the Deed only to the extent expressly provided herein.

24.    Recording.  This Agreement shall not be recorded.

25.    Time.  Time is of the essence of this Agreement and each and every provision hereof. Any extension of time granted for the performance of any duty under this Agreement shall not be considered as an extension of time for the performance of any other duty under this Agreement.  As used in this Agreement, "business day" refers to any day which is not a Saturday, Sunday or a holiday in the State of California, as defined in California Government Code Section 6700.  In the event the time for performance of any obligation hereunder shall fall on a Saturday, Sunday or a holiday, such time for performance shall be extended to the next business day.

26.    Counterparts.  This Agreement may be executed electronically and in several counterparts, which shall be treated as originals for all purposes, and all counterparts so executed shall constitute one agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original or to the same counterpart.  Any such counterpart shall be admissible into evidence as an original hereof against the person who executed it.

27.    Disclosure Statement.  Seller may, but is not obligated to, deliver to Buyer a Natural Hazard Disclosure Statement (the "**Statement**") in the form provided under California law.  If Seller provides a Statement to Buyer, the Statement will purport to disclose whether the Real Property is located in a special flood hazard area, a dam inundation failure area, a high fire severity area, a wildland fire area, an earthquake fault zone and/or a seismic hazard area (collectively, the "**Natural Hazard Areas**"). Buyer represents and warrants to Seller as follows:  (a) Buyer and its agents are sophisticated investors in real estate and possess the expertise to assess whether the Real Property is located in any of the Natural Hazard Areas and the impact on Buyer's use, operation, development and enjoyment of the Real Property if the Real Property is located in any of the Natural Hazard Areas, (b) prior to the last day of the Due Diligence Contingency, independent of the Statement, Buyer shall have determined whether the Real Property is located in any of the Natural Hazard Areas and will have assessed the impact on Buyer's use, operation, development and enjoyment of the Real Property if the Real Property is located in any of the Natural Hazard Areas, and (c) Buyer is not relying on the Statement (if one is delivered) in consummating the transactions contemplated hereby.  If Seller delivers a Statement to Buyer, Buyer agrees that Seller shall have no liability to Buyer for any errors or omissions in the Statement.  Buyer hereby waives any right it may have to receive a Statement from Seller and such waiver includes any right Buyer may have to terminate this Agreement as a result of any such failure under California Civil Code Section 1103.3 or otherwise.  Buyer hereby releases Seller from any liability Seller may have to Buyer as a result of Seller's failure to deliver a Statement to Buyer, including, without limitation, any damages recoverable under California Civil Code Section 1103.13.  Buyer also indemnifies and shall defend and hold harmless Seller from and against any claims made against Seller for failure to obtain or provide the Statement.  The representations, warranties and agreements set forth herein shall survive the consummation of the transactions contemplated hereby.

28.    Section 25359.7 of Health and Safety Code.  Section 25359.7 of the California Health and Safety Code requires owners of non-residential real property who know, or have reasonable cause to believe, that any release of hazardous substance has come to be located on or beneath the real property to provide written notice of such to a buyer of the real property.  Buyer acknowledges and agrees that the sole inquiry and investigation Seller has conducted in connection with the environmental condition of the Property is to obtain and/or review those certain environmental assessments and studies of the Property that have been delivered to Buyer pursuant to this Agreement (collectively, "**Seller's Environmental Reports**").  Buyer (a) acknowledges Buyer's receipt of the foregoing notice given pursuant to Section 25359.7 of the California Health and Safety Code; (b) will be, prior to the expiration of the Review Period, fully aware of the matters described in the Seller's Environmental Reports; and (c) after receiving

- 17 -

advice of Buyer's legal counsel, waives any and all rights Buyer may have to assert that Seller has not complied with the requirements of Section 25359.7 of the California Health and Safety Code. Buyer also indemnifies and shall defend and hold harmless Seller from and against any claims made against Seller for any alleged failure to comply with the requirements of Section 25359.7 of the California Health and Safety Code.   The representations, warranties and agreements set forth herein shall survive the consummation of the transactions contemplated hereby.

[Signatures on the following page.]

DATED as of the Effective Date.

**SELLER:**

CPIF LA ARTS DISTRICT, LLC,
a Washington limited liability company,
Debtor and Debtor in Possession

By: _____

Name: Allan Spragins

Its: COO & General Counsel


**BUYER:**

DTLA MGMT, CORP.,
a California corporation

By: _____
    ALONA HASSID

Name: ALONA HASSID

Its: Manager

Docusign Envelope ID: F38D837B-EEB3-47A5-A2E3-7D1A68BBF2D3

<u>EXHIBIT A</u>
TO PURCHASE AND SALE AGREEMENT

<u>Legal Description of the Property</u>

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY
OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOTS 19 THROUGH 24 INCLUSIVE IN BLOCK "C" OF F.P. HOWARD AND CO'S SUBDIVISION OF THE BLISS
TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER
MAP RECORDED IN BOOK 12 PAGE 42 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

APN: 5163-025-009

EXHIBIT B
TO PURCHASE AND SALE AGREEMENT

Form of Deed

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

_____

_____

_____

MAIL TAX STATEMENTS TO:

_____

_____

_____

**GRANT DEED**

THE UNDERSIGNED GRANTOR DECLARES:

Documentary transfer tax is $_____

( )    computed on full value of property conveyed, or
( )    computed on full value, less value of liens and encumbrances
        remaining at time of sale.

_____
Signature of Declarant

Parcel No.: _____

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

_____ ("Grantor") hereby grants to _____ ("Grantee"), that certain real property located in the City of _____, County of_____, State of California, and more particularly described as follows (the "Property"):

See attached Exhibit A, incorporated by reference to this document.

This Deed and the conveyance hereinabove set forth is executed by Grantor and accepted by Grantee subject to (i) non-delinquent real estate taxes and general and special assessments, and (ii) all other matters of record affecting the Property.

[INSERT SIGNATURES AND ACKNOWLEDGMENTS]

<u>EXHIBIT C</u>
TO PURCHASE AND SALE AGREEMENT

<u>Form of Bill of Sale</u>

**BILL OF SALE**


THIS BILL OF SALE is executed as of the _____ day of _____, 202_, by CPIF LA ARTS DISTRICT, LLC, a Washington limited liability company ("**Seller**"):

**FOR VALUE RECEIVED**, receipt of which is hereby acknowledged, Seller does hereby grant, bargain, sell, convey, assign, transfer, and set over unto _____("**Buyer**") all fixtures, furniture, equipment, furnishings, and other personal property (other than computer hardware and software) owned by Seller (the "**Personal Property**") located on that certain real property located in Los Angeles County, California which real property has been sold by Seller to Buyer as of the date hereof and which is more particularly described on <u>Exhibit A</u> attached hereto.

Seller shall warrant and forever defend the right and title to the above described personal property unto Buyer against the lawful claims of all persons owing, holding or claiming by, through or under Seller, but not otherwise.  In all other respects, the Personal Property is being transferred in its "as is, where is" condition, and without representation or warranty.

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale as of the day and year first above written.


[INSERT SIGNATURE BLOCK & EXHIBIT PRIOR TO SIGNING]

<u>EXHIBIT D</u>
TO PURCHASE AND SALE AGREEMENT

<u>Form of Assignment and Assumption of Tenant Leases</u>

**ASSIGNMENT AND ASSUMPTION OF TENANT LEASES
AND SECURITY DEPOSITS**

This Assignment and Assumption of Tenant Leases and Security Deposits (this "**Assignment**"), effective as of the _____ day of _____, 202_, is made by and between CPIF LA ARTS DISTRICT, LLC, a Washington limited liability company ("**Assignor**"), and _____ ("**Assignee**"):

In consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Property</u>.   The "**Property**" means the real property located in Los Angeles County, California, which is legally described in <u>Exhibit A</u> attached to this Assignment, together with the building, structures and other improvements located thereon.

2.    <u>Leases</u>.   The "**Leases**" means the leases affecting the Property, more particularly described in the <u>Exhibit B</u> certified rent roll attached to this Assignment.

3.    <u>Security Deposits</u>.   "**Security Deposits**" means the refundable security and other refundable deposits held by or for Assignor on account of tenants under the Leases with respect to which were transferred to Assignee in cash or Assignee received a credit at the closing of the transaction pursuant to this Assignment.  The Security Deposits are also set forth in the <u>Exhibit B</u> certified rent roll.

4.    <u>Assignment</u>.   Assignor hereby grants, transfers and assigns to Assignee the entire right, title and interest of Assignor in and to the Leases and the Security Deposits.

5.    <u>Assumption</u>.   Assignee hereby assumes the covenants, agreements and obligations of Assignor as landlord or lessor under the Leases which are applicable to the period and required to be performed from and after the date of this Assignment, but not otherwise, and Assignee further assumes all liability of Assignor for the proper refund or return of the Security Deposits if, when and as required by the Leases.  No person or entity, other than Assignor shall be deemed a beneficiary of the provisions of this <u>Section 5</u>.

6.    <u>Indemnification</u>.   Assignor shall indemnify and hold Assignee harmless from and against all obligations of the "lessor" or "landlord" under the Leases to the extent such obligations were applicable to the period and required to be performed prior to the date of this Assignment.  Assignee shall indemnify and hold Assignor harmless from and against all obligations of the "lessor" or the "landlord" under the Leases to the extent that such obligations are applicable to the period and required to be performed from and after the date of this Assignment.

7.    <u>Legal Expenses</u>.   If either party to this Assignment brings suit or otherwise becomes involved in any legal proceedings seeking to enforce the terms of this Assignment, or to recover damages for their breach, the prevailing party shall be entitled to recover its costs and expenses (including fees of attorneys, expert witnesses, accountants, court reporters and others) incurred in connection therewith including all such costs and expenses incurred in: (a) in trial and appellate court proceedings, (b) in

connection with any and all counterclaims asserted by one party to this Assignment against another whether or not such counterclaims arise out of or are otherwise related to this Assignment, (c) in bankruptcy or other insolvency proceedings, and (d) in post-judgment collection proceedings.

8.    <u>Successors and Assigns</u>.  This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

9.    <u>Power and Authority</u>.  Each party represents and warrants to the other that it is fully empowered and authorized to execute and deliver this Assignment, and the individual signing this Assignment on behalf of such party represents and warrants to the other party that he or she is fully empowered and authorized to do so.

10.    <u>Counterparts</u>.  This Assignment may be executed in several counterparts, each of which shall be deemed an original, but all of, which shall constitute one agreement, binding on all parties.

[INSERT SIGNATURE BLOCKS & EXHIBITS PRIOR TO SIGNING]

EXHIBIT E
TO PURCHASE AND SALE AGREEMENT

Form of Assignment and Assumption of Contracts

**ASSIGNMENT AND ASSUMPTION OF
SERVICE CONTRACTS AND INTANGIBLES**

THIS ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS AND INTANGIBLES (this "**Assignment**") is entered into as of the _____ day of _____, 202_, by and between CPIF LA ARTS DISTRICT, LLC, a Washington limited liability company ("**Assignor**"), and _____ ("**Assignee**"), who agree as follows:

1.    Property.    The "**Property**" means the real property located in Los Angeles County, California, legally described in **Exhibit A** attached to this Assignment, together with the building, structures and other improvements located thereon.

2.    Service Contracts.    "**Service Contracts**" means those maintenance, supply and service agreements, equipment leases, utility agreements, rights under bonds, and similar agreements relating to the Property and set forth in Exhibit B attached hereto.

3.    Intangibles.    "**Intangibles**" means, to the extent assignable by Assignor, those records in Assignor's possession (if any) respecting plans, specifications, building permits, certificates of occupancy, signs, maintenance supplies, utilities, permits, approvals, studies, surveys, guaranties, warranties, and any other similar items, relating to the Property.

4.    Assignment.    For good and valuable consideration received by Assignor, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby grants, transfers and assigns to Assignee the entire right, title and interest of Assignor in and to the Service Contracts and the Intangibles.  Assignor shall continue to be responsible for and shall perform and satisfy its obligations under the Service Contracts insofar as such obligations relate to the period on or before the date of this Assignment. Notwithstanding anything to the contrary, Assignee acknowledges that Assignor has not made and does not make any representation or warranty regarding the Intangibles, including, without limitation, if any or all of the Intangibles (i) are still in effect at Closing or (ii) can be assigned to Assignee.

5.    Assumption.    Assignee hereby assumes the covenants, agreements and obligations of Assignor under the Service Contracts which are applicable to the period and required to be performed from and after the date of this Assignment, but not otherwise.  No person or entity other than Assignor shall be deemed a beneficiary of the provisions of this Section 5.

6.    Indemnification.    Assignor shall indemnify and hold harmless Assignee from and against all obligations of the Assignor under the Service Contracts to the extent such obligations were applicable to the period and required to be performed prior to the date of this Assignment.  Assignee shall indemnify and hold harmless Assignor from and against all obligations assumed by the Assignee under the Service Contracts to the extent that such obligations are applicable to the period and required to be performed from and after the date of this Assignment.

7.    Legal Expenses.    If either party to this Assignment brings suit or otherwise becomes involved in any legal proceedings seeking to enforce the terms of this Assignment, or to recover damages for their breach, the prevailing party shall be entitled to recover its costs and expenses (including fees of

attorneys, expert witnesses, accountants, court reporters and others) incurred in connection therewith including all such costs and expenses incurred: (a) in trial and appellate court proceedings, (b) in connection with any and all counterclaims asserted by one party to this Assignment against another whether or not such counterclaims arise out of or are otherwise related to this Assignment, (c) in bankruptcy or other insolvency proceedings, and (d) in post-judgment collection proceedings.

8.    <u>Successors and Assigns</u>.  This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

9.    <u>Power and Authority</u>.  Each party represents and warrants to the other that it is fully empowered and authorized to execute and deliver this Assignment, and the individual signing this Assignment on behalf of such party represents and warrants to the other party that he or she is fully empowered and authorized to do so.

10.    <u>Counterparts</u>.  This Assignment may be executed in several counterparts, each of which shall be deemed an original, but all of, which shall constitute one agreement, binding on all parties.

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the day and year first above written.

[INSERT SIGNATURE BLOCKS & EXHIBITS PRIOR TO SIGNING]

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034.

A true and correct copy of the foregoing document entitled: **Debtor's First Amended Chapter 11 Plan, As Modified** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 9, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- David B Golubchik    dbg@lnbyg.com, dbg@lnbyg.com
- Carmela Pagay    ctp@lnbyg.com
- Matthew D Pham    mpham@allenmatkins.com, mdiaz@allenmatkins.com
- David Samuel Shevitz    David.S.Shevitz@usdoj.gov
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- David R Zaro    dzaro@allenmatkins.com

**2.  SERVED BY UNITED STATES MAIL**: On **October 9, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

☐ Service list attached

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 9, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 9, 2025 | Rebecka Merritt | /s/ Rebecka Merritt |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.